**CHARTER NATIONAL BANK—HOUSTON,**
Appellant,

v.

**Thomas H. STEVENS, Appellee.**

**No. A14–88–421–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 26, 1989.

Rehearing Denied Nov. 30, 1989.

Larry Huelbig, Audrey Selden, Houston, for appellant.

James M. Bright, Donald J. Dombrowski, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and JUNELL and DRAUGHN, JJ.

## OPINION

JUNELL, Justice.

Charter National Bank—Houston appeals from the judgment in the amount of $54,315 granted appellee Stevens upon his suit for damages from wrongful foreclosure. Appellant bank brings five points of error: (1) an improper causation element of wrongful foreclosure was submitted to the jury; (2) the appellee suffered no damages as a matter of law; (3) it was improper for trial counsel to testify on a contested fact issue; (4) there was no competent evidence that an excluded prospective bidder was ready, willing and able to purchase the property at the foreclosure sale; and, (5) there was no jury finding that a prospective purchaser stood ready, willing and able to pay the market value of the property found by the jury. We affirm.

Appellant bank made loans to appellee for the refinancing of an unimproved three acre parcel of real estate, the subsequent construction of a commercial building on the land, and working capital to conduct his business. The loans were evidenced by two promissory notes secured by first and second lien deeds of trust on the real estate. The parties stipulated that, at the date of appellant's foreclosure on the realty, the aggregate unpaid indebtedness due appellant by appellee on the two notes was $375,685.

Faced with business hardship, appellee leased certain space in the commercial building to others and attempted to sell the property. One of the tenants became interested in buying, but a price was never agreed upon. More than a year prior to foreclosure, appellee and appellant bank began negotiations to restructure the loans which were never completed. When the loans became delinquent, foreclosure notices were posted. On three occasions the foreclosure sales were aborted when appellee made payments on his debt. When appellant bank noticed the property for foreclosure a fourth time, the interested tenant contacted the bank to find out if the foreclosure sale would occur as scheduled. The tenant, Western Protek, Inc. (hereafter usually referred to as "tenant"), knew there was a pending "regular" sale which, if completed, could have obviated a foreclosure sale.

According to the tenant's president, his inquiries about the foreclosure sale began the week before its scheduled date. He told the bank's representative of his interest in attending the sale and bidding on the property. He did this in several different phone conversations prior to the date of the sale. The last of these conversations was about 3:00 p.m. on Monday, April 30, 1984, the afternoon before the first Tuesday of May, 1984, the statutory date set for such sales at the courthouse door. The tenant's Dallas attorney was in Houston on that Monday afternoon and was prepared to stay over for the sale if it was to go forward. Just before 5:00 p.m., the tenant's president again called the bank and was told by a secretary that the bank's loan officer had left for the day. The tenant's attorney testified that he had personally arranged $400,000 of interim financing with a Dallas bank to enable the tenant to bid at the foreclosure sale.

The tenant's president testified that the bank officer said in each telephone conversation that he did not know for sure if the sale would take place as scheduled but that he finally promised he would give the tenant adequate and timely notice if it was in fact going to be held the next day. On the morning of the sale the tenant's president resumed his phone calls to the bank officer without making any contact.

The sale was held on the noticed day, having been arranged the previous week with the bank's outside counsel who served as substitute trustee. The bank failed to

contact the tenant as promised. The bank was the only bidder, successful at the sum of $355,000, which was approximately 95% of the indebtedness due appellant bank by appellee, and approximately 84% of the $430,000 fair market value found by the jury. After foreclosure the tenant offered to buy the property from the bank at its $355,000 successful bid price. The bank was said to have asked a minimum of $420,000. Three days after the bank's purchase it obtained fire and extended insurance coverage on the property in the amount of $425,000. The tenant filed a lis pendens as well as this suit for damages against appellant bank for negligence, fraud, and promissory estoppel, alleging tenant had been ready, willing and able to bid up to $400,000 for the property and that the tenant had plans to go higher if necessary, and to at least "match" the bank's bid. The bank sold the property "as is" a few months later for $385,000, clouded by the lis pendens.

Appellee Stevens intervened in the lawsuit about a year after it was filed, claiming wrongful foreclosure and seeking actual and exemplary damages.

The bank officer testified that he knew the tenant was interested in buying the property and wanted to attend the foreclosure sale, but he denied having made any promise to call back. On direct examination the bank officer explained that he had been reluctant to talk with the tenant about the foreclosure sale, claiming a duty of confidence to the bank's mortgagor-client, appellee Stevens. Upon being cross-examined, the following happened:

Q. Okay. Now, both Mr. Stevens and the bank, you've got a duty to both of them?

A. Yes, sir.

Q. All right. Okay. Wouldn't your duty to the bank have been best served by getting as many bidders at as high a price as you could for the property?

A. Yes, sir.

Q. And wouldn't your duty to Mr. Stevens have been best served by getting as many bidders at the highest price that you could for that property?

A. Yes, sir.

The jury made the following findings pertinent to this appeal:

1. Allan Boss, a loan officer at the bank, did promise to call Cecil Brandon, president of Western Protek, Inc. before the end of the day on April 30, 1984, if Charter Bank intended to proceed with the sale scheduled for May 1, 1984.

2. Allan Boss should have foreseen that Cecil Brandon would rely upon his promise.

3. Western Protek, Inc. did substantially rely on Allan Boss' promise to its detriment.

4. (1) the promise was material to Western Protek, Inc.;
   (2) the promise was false;
   (3) Allan Boss knew it was false when made or he made it with reckless disregard of the rights of Western Protek, Inc.; and,
   (4) Western Protek, Inc. did rely upon the promise to its detriment.

5. Western Protek, Inc. was ready, willing and able to pay to the bank cash up to the sum of $400,000.00 on May 1, 1984.

6. The failure of Western Protek, Inc. to attend the foreclosure sale affected the fairness of the sale of the property owned by Stevens.

7. The fair market value of the property as of May 1, 1984, was $430,000.00.

The jury answered in the negative the issue inquiring whether Boss's promise to call Brandon was made with the intent that the tenant, Western Protek, Inc., would rely thereon.

Judgment was rendered for appellee in the amount of $54,315, being the difference between the fair market value as found by the jury and the stipulated indebtedness due appellant bank of $375,685. Judgment also was rendered denying the tenant any recovery against the bank. The tenant, Western Protek, Inc., is not a party to this appeal.

In its first point of error appellant points out that the special issue presented to the jury asked for a finding on the "fairness" of the foreclosure sale but failed to ask whether any "unfairness," if found, proximately caused a *gross inadequacy of selling price*. The special issue which was actually submitted to the jury had this phrasing:

Do you find that the failure of Western Protek, Inc. to attend the foreclosure sale affected the fairness of the sale of the property owned by Thomas H. Stevens?

Appellant bank requested the two following special issues and one instruction, all of which were refused:

Do you find that the price bid by (appellant bank) at the May 1, 1984, foreclosure upon the subject property, namely the sum of $355,000.00 was a "grossly inadequate bid price?"

[You are hereby instructed that the term "grossly inadequate bid price" means a bid price so far short of the real value of the property as to shock a correct mind, and thereby raise a presumption that fraud attended the purchase.] Do you find that the representation by (appellant bank) to (tenant), ..., was the proximate cause of the grossly inadequate bid price?

Appellant bank urges us to find that the charge to the jury should have included questions on three elements of wrongful foreclosure: (1) a defect in the foreclosure sale proceedings; (2) a *grossly inadequate selling price;* and (3) a causal connection between the defect and the *grossly inadequate selling price.*

■ We have traced the threads of Texas law on wrongful foreclosure back through more than one hundred years. Texas law conforms with the general rule found in other jurisdictions that mere irregularities in the conduct of the foreclosure sale will not vitiate the sale unless the irregularities result in injury to the mortgagor. 59 C.J.S. *Mortgages* § 572 (1949). In the development of Texas law, however, a universal need for the plaintiff to prove a *grossly inadequate selling price* may have

inadvertently crept into the picture as to *all* lawsuits for wrongful foreclosure. We believe this to be an erroneous portrayal. It never was intended that there should be an automatic need to prove a *grossly inadequate selling price* in a situation where the bidding at a non-judicial foreclosure sale was deliberately "chilled" by the affirmative acts of a mortgagee and the injured mortgagor seeks a recovery of damages rather than a setting aside of the sale itself.

The facts of the case before us are distinguishable from the facts in *University Sav. Ass'n v. Springwoods Shopping Center*, 644 S.W.2d 705 (Tex.1982).

*Springwoods* involved the appointment by the mortgagee of a substitute trustee and the consequences of tardiness in recording that appointment in the county deed records. As in the case now before us, damages were sought by the mortgagor for wrongful foreclosure. The supreme court held that an actual written notice which had been sent to the mortgagor barred his action for wrongful foreclosure, and also that failure to timely record the appointment did not affect the legality and fairness of the trustee's sale. In so holding in *Springwoods*, the supreme court found applicable "the test laid down in *American Savings and Loan Assoc. of Houston v. Musick*, 531 S.W.2d 581 (Tex. 1975)." The test laid down in *Musick* has two parts: (1) mere inadequacy of consideration does not render a foreclosure sale invalid if the sale is otherwise legal and proper; and, (2) there must be evidence of irregularity, though slight, which caused or contributed to cause the property to be sold for a *grossly inadequate price*. Inadequate selling price, grossly or otherwise, was never addressed in *Springwoods*. The only issue in *Springwoods* involved a provision in the deed of trust and whether a failure to follow it strictly, as prescribed by *Slaughter v. Qualls*, 139 Tex. 340, 162 S.W.2d 671 (1942), created any irregularity in the trustee's sale. The only rationale for mentioning the *Musick* test in the *Springwoods* decision was to emphasize the fact that the matter could go no further

because there was no showing of an irregularity which would have been necessary to properly trigger a cause of action.

*American Savings and Loan Assoc. of Houston v. Musick*, 531 S.W.2d 581 (Tex. 1975) was a trespass to try title case brought by a mortgagee. The defendants countered with action to set aside the trustee's deed issued after foreclosure sale. The supreme court found a number of technical matters of no substance but held that certain methods used to appoint a substitute trustee did not constitute an irregularity in the trustee's sale. Since there were no irregularities in the trustee's sale, the *Musick* court did not reach the issue of adequacy of consideration. The prongs of the test were stated to emphasize the need for there to be an irregularity followed by proof of causation for a sale at a grossly inadequate price before any setting aside of the trustee's sale could properly be considered.

Neither *Springwoods* nor *Musick* involved adequacy of selling price in connection with any affirmative acts of a mortgagee directly impacting upon the fairness of the auction process at the courthouse steps including the attracting or repelling of qualified bidders. Therefore, the supreme court did not find the second part of the *Musick* test applicable to wrongful foreclosure suits where deliberate acts of the mortgagee actually put a chill on the bidding and caused a lower selling price of *any* measurable magnitude, grossly inadequate or otherwise.

The *Musick* test was derived from two other cases cited in the *Musick* opinion. One of them, *Tarrant Savings Association v. Lucky Homes, Inc.*, 390 S.W.2d 473, 475 (Tex.1965), gives support for the first part of the test which is the proposition that mere inadequacy of consideration is an insufficient ground for setting aside a foreclosure sale. In *Tarrant*, the mortgagor alleged unfair or wrongful conduct of the savings and loan mortgagee's employees in the foreclosure sale proceedings. It was found not unreasonable for one of the savings and loan employees, who was also substitute trustee, to recommend to a fellow employee the price at which that fellow employee should bid at the sale on behalf of the mortgagee employer. The word "grossly" is not found in the *Tarrant* opinion in connection with "inadequacy of price" at foreclosure sale, so the necessity for a unification of the words into a "grossly inadequate price" was neither discussed nor tested in *Tarrant*.

The other citation in *Musick*, *Sparkman v. McWhirter*, 263 S.W.2d 832, 837 (Tex. Civ.App.—Dallas 1953, writ ref'd), supports the proposition that evidence of irregularity must be found as the cause of a sale at a *grossly inadequate price* in order to avoid a trustee's sale. *Sparkman* was an unsuccessful appeal from summary judgment on a trespass to try title suit brought by the buyer of property at a trustee's sale. The mortgagor's counter-action to set aside the trustee's sale contained allegations which, as narrowed by the appellate court, charged that a scheme or plan had been created and used in concert by the buyer and the trustee's representative to discourage free and competitive bidding at the sale, thereby creating a windfall for the buyer who was the father-in-law of the trustee's representative. These allegations were never tested on appeal, however. The defendant (counter-plaintiff) had failed to file affidavits in support of his opposition to the movant's sworn proof that there was no scheme or plan and the battle was lost solely on procedural grounds. The need for a connection between any gross inadequacy of price and affirmative acts which chilled the bidding at foreclosure sale was therefore never even confronted in *Sparkman*.

*Sparkman* cites two old supreme court cases: *McKennon v. McGown*, Tex.Sup., 11 S.W. 532 (1889), and *Allen v. Pierson*, 60 Tex. 604 (1884). *McKennon* reviewed a jury charge confined to the issue of fraud as a basis for avoiding a sale. The jury was erroneously told that a *grossly inadequate price* may, in the absence of proof that the sale was fairly made, be sufficient to justify the jury in finding that such sale was fraudulent. Reversing and remanding in *McKennon*, the supreme court found the controlling issues to be whether the irregu-

larities complained of and upon which the sheriff's sale was sought to be vacated (sale held on a legal holiday) were sufficient, when considered in connection with any *gross inadequacy of price* supported by the evidence, to justify annulling the sale, and whether such irregularities did or did not "conduce" to such inadequacy of consideration, attributing the latter test to *Allen v. Pierson,* 60 Tex. 607.

*Allen v. Pierson*[1] arose from a trial court action in which the plaintiff, a judicial debtor, successfully recovered his 200 acres of land which had been sold by the sheriff for $61 to satisfy a judgment against him. Testimony showed the land had a fair market value of somewhere between $400 and $2,000, meaning the successful bid price equated to a fraction of $\frac{1}{6}$th to $\frac{1}{33}$rd of the fair market value of the land. Certain technical irregularities surrounded the sheriff's conduct of the sale. The question was whether to void the sale and restore both the former landowner and the buyer to their original posi-

tions because of the obvious inadequacy of consideration which may or may not have been caused by the irregularities in the sheriff's sale procedures. The judicial dilemma centered on the need to balance fairness for the deprived landowner with the possible poisoning of future sheriff's sales to the general detriment of society. In grappling with the problem, the supreme court recognized that an indiscriminate voiding of judicial sales would create such uncertainty in the minds of prospective buyers that the number of bidders and the prices bid at such sales would automatically diminish in the future because of a high risk of rescission. In what may have been dicta, the supreme court stated that where enormous inadequacies of selling price are accompanied by very small irregularities in the sale, there might be sufficient grounds to void such judicial sale, given a causal connection, and the court suggested that the more gross the inadequacy of fair consideration paid, the smaller the irregularity necessary to trigger an annulment of the sale. (This perhaps implies that a small

---

1. *Allen v. Pierson,* is built on five other cases from the Texas Reports which preceded the Southwestern Reporter series:

*Pearson v. Hudson,* 52 Tex. 352 (1879).—12 Acres of improved land sold by sheriff to judgment creditor for $10, whereas fair market value was $500 to $1,000. Purchaser was charged with notice of sale irregularities, which, combined with grossly inadequate selling price was sufficient to avoid the sale.

*Pearson v. Flanagan,* 52 Tex. 266 (1879). 4 Parcels of land exceeding 640 acres and claimed to have a fair market value of $6,500 sold by sheriff to judgment creditor for $77.60. Although remanding due to erroneous jury instruction, the court said, "It is the policy of the law, for the benefit of both the debtor and creditor, that judicial sales, when fairly made, should, as a general rule, be upheld. To hold otherwise would have a tendency to deter parties both from purchasing and from paying the fair prices, and would lead to a sacrifice of the property."

*Taul v. Wright,* 45 Tex. 388 (1876). 860 Acre plantation sold by sheriff for $30 whereas fair market value was $5000. In affirming the trial court's cancellation of the sheriff's deed after jury findings the court observed, "(T)here may be cases in which the price paid is so utterly insignificant and shockingly disproportionate to the value of the property, that a court of equity cannot regard it as in conscience any consideration whatever, and the mere fact of attempting to hold the prop-

erty so purchased will be held conclusive evidence of fraud."

*Chamblee v. Tarbox,* 27 Tex. 139 (1863). 1107 Acres sold by sheriff for the total sum of $5 whereas the land had a market value of one dollar per acre. In remanding due to improper jury charge the court noted, "If the bargain is one which no man in his senses would make, and that no honest and fair man should accept, and there are circumstances attending the sale which may have operated to prevent the property from bringing a higher price, although at the time, they may in fact have been unknown to the purchaser, the sale will be regarded by the court as, in its legal sense, fraudulent."

*Allen v. Stephanes,* 18 Tex. 658 (1857). Lot at the foot of Main Street, Houston, sold for $30 by sheriff whereas fair market value was $600. In affirming the trial court's jury-finding of fraud and the setting aside of the judicial sale the court held, "The rule as laid down in the charge of the court, and as it is generally expressed, is, that inadequacy of price at a sale made under process of law, is not sufficient, without additional circumstances, to invalidate the sale. But in cases where the disproportion is so enormous as in this, but slight additional circumstances will justify that the sale is fraudulent." (In this case, the witness who was willing to give $600 for the property came to the sale intending to bid. When he was told the sale had been adjourned, he left.)

inadequacy of selling price might be the basis for voiding a sale accompanied by enormous or outrageous irregularities in the sales procedures, given a causal connection and if the sale is not already void.)

The means for finding a causal connection between irregularities of the sale and inadequacy of selling price is described with clarity in *Allen v. Pierson*. "(U)nder our system it is a question of fact to be determined from the evidence whether or not the irregularity had any influence upon the consideration for which the property sold. It is not a matter of law to be assumed by the court." Therefore, in the present case the issue of irregularity of the foreclosure sale, or "fairness" was properly put before the jury.[2]

■ All of the policy reasons behind the early Texas decisions involving technical irregularities in judicial sales seem to have equal value in modern cases involving sales under the power of sale terms in mortgages and deeds of trust. Given the same types of technical irregularities, there seems to be no reason for having a different philosophy toward setting aside sales of property by the sheriff at the direction of the court and sales made under the terms of trust agreements or mortgages. However, where there is a deliberate chilling of the bidding process, the situation is entirely different. Legal authorities now recognize that a mortgagor, even though in default, has a right to an orderly disposition of the property in which the creditor has a security interest, and if a defect deters third party bidding, then an action for damages should lie. G.S. NELSON, REAL ESTATE FINANCE LAW, 558 (2d ed. 1985). "Recovery of damages is allowable on the theory that the wrong committed somewhat resembles that of a conversion of personal property." *Owens v. Grimes*, 539 S.W.2d 387 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.), citing *John Hancock Mutual Life Ins. Co. v. Howard*, 85 S.W.2d 986

(Tex.Civ.App., Waco 1935, writ ref'd). The wrongdoer should be held accountable for his acts under a different set of policy reasons than those affecting the setting aside of a sheriff's or trustee's sale for technical irregularities. Those different reasons provide restitution and also are designed to deter wrongful acts[3] calculated to injure a helpless mortgagor and unjustly enrich a machiavellian mortgagee. Those reasons have nothing to do with balancing the mortgagor's needs and interests in the property with those of a foreclosure purchaser. When the mortgagor elects damages as his remedy he confirms the act of sale and he *has* no further interest in the property. *See Owens v. Grimes*, 539 S.W.2d, at 390. *Accord, Diversified, Inc. v. Gibraltar Sav. Ass'n*, 762 S.W.2d 620 (Tex.App.—Houston [14th Dist.] 1988, no writ). Society and the injured mortgagor are properly served through money damages, if that election has been made, where deliberate acts of the mortgagee had a "chilling" effect on the bidding. Under such facts there seems to be no rational ground for requiring a finding that the foreclosure selling price was "grossly inadequate." Given proof of proximate cause, the damages should be recoverable.

■ There is ample evidence of a "chilling" in the case before us. The jury found irregularities, or "unfairness," in the foreclosure sale process and it set a fair market value on the property at the date of foreclosure sale, both as the jury was asked to do. If the jury had answered "no" to the question of unfairness, any further jury finding of a fair market value would have been of no consequence. There was no need for a special jury issue on "grossly inadequate bid price" to give the trial judge enough findings for him to make a proper judgment. To the extent other findings may have been necessary to support other elements of the cause of action, the evi-

---

2. The issue of grossly inadequate consideration is also a fact question. *See FLR Corp. v. Blodgett*, 541 S.W.2d 209, 215 (Tex.Civ.App.—El Paso 1976, writ ref'd n.r.e.), cert. denied, 434 U.S. 915, 98 S.Ct. 386, 54 L.Ed.2d 273 (1977). *Accord, Intertex, Inc. v. Walton*, 698 S.W.2d 707,

710, 711 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.).

3. Exemplary damages are also available under some circumstances. 14 TEX. TECH L.REV. 732, n. 237.

dence supports their having been deemed to have been found in favor of the judgment under Rule 279, TEX.R.CIV.P. Appellant's first point of error is overruled.

Appellant brings as his second point of error the argument that there was no net recovery due appellee even if the jury findings are permitted to stand because the promissory notes at issue included a stipulation for reasonable attorney fees of fifteen percent (15%) of the unpaid amounts due thereunder, which would bring the modified unpaid principal, interest and stipulated attorney fees to an aggregate of $432,037.75, a sum greater than the fair market value of $430,000 found by the jury. Appellant cites *Tarrant Savings Ass'n v. Lucky Homes, Inc.*, 390 S.W.2d 473, 475 (Tex.1965) to support its view that appellee had no recoverable damages as a matter of law, arguing that deficiency judgment rules would leave no surplus in which appellee may participate. All evidence in the record showing a $375,685 stipulated sum due under the two notes makes no reference whatsoever to which part of that sum of money is earmarked for principal, interest, attorney fees, or anything else. There is no support for an argument that attorney fees of 15 percent should be added to the stipulated amount due. Appellant's second point of error is overruled.

In its third and fourth points of error appellant complains that assistant counsel of record for the tenant plaintiff was improperly allowed to testify to tenant's being ready, willing and able to participate in the foreclosure sale to the extent of $400,000 in bank loans secured on behalf of the tenant by oral commitment. Appellant claims that (1) the parties stipulated in advance that counsel for the tenant (who was a shareholder and general counsel for tenant) would not be called to testify, and (2) the testimony is a violation of Ethical Consideration 5–9 of the State Bar Rules. Having challenged the testimony of counsel for the tenant plaintiff, appellant asserts that there was no other competent evidence to prove tenant plaintiff was ready, willing and able to be a viable bidder at the foreclosure sale even if notice had

been given as promised on the eve of the sale by appellant.

The record shows that there was no unconditional promise not to call the attorney who testified at trial; and even if there had been an unconditional promise, there is no support for appellant's view that his testimony should or can be ignored. Appellant's third and fourth points of error are overruled.

■■■ Appellant brings a fifth and final point of error claiming the measure of damages should not have been the difference between the stipulated unpaid indebtedness of $375,685 and a fair market value of $430,000 as found by the jury because there was no additional finding that there was any potential purchaser ready, willing and able to pay such a market price. The argument focuses on the absence of any competent bidder ready, willing and able to pay any price, or in the alternative that the $400,000 amount found to have been available from the tenant plaintiff should yield a judgment of only $24,315. There was direct evidence introduced to support a fair market value of at least $430,000, including an earnest money contract between appellee and a third party at that sum. Even though conditioned upon the prospective purchaser being able to secure financing for consummating the transaction, the earnest money contract is some evidence of value, and there was other evidence to support a jury finding of a fair market value of $430,000 in accordance with the definition given in the jury charge. Appellant acknowledges that appellee's measure of damages is prescribed in *Farrell v. Hunt*, 714 S.W.2d 298, 299 (Tex.1986), being the difference between the fair market value of the property at the date of wrongful foreclosure, if any, and the remaining balance due on the indebtedness. However, appellant offers no authority to show appellee's need to prove there was a prospective third party purchaser ready, willing, and able to bid at least the amount of the fair market value as determined by the finder of fact. Appellant's fifth point of error is overruled.

The judgment of the trial court is affirmed.