**FEDERAL DEPOSIT INSURANCE CORPORATION, In Its Corporate Capacity, Plaintiff–Appellee,**

v.

**Henry H. BLANTON, Defendant–Appellant.**

**No. 89–1902.**

United States Court of Appeals, Fifth Circuit.

Dec. 6, 1990.

Rehearing Denied Jan. 4, 1991.

Mark H. How, Denton & Guinan, Marcia F. Pennell, Short, Kimbell & How, Dallas, Tex., Wiley F. James, III, Bernard R. Given, II, Grambling & Mounce, El Paso, Tex., for defendant-appellant.

Ann S. DuRoss, Asst. Gen. Counsel, Joan E. Smiley, Sr. Counsel, Christopher L. Hencke, FDIC, Washington, D.C., Robert J.

Clary, Johnson, Bromberg & Leeds, Dallas, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, REAVLEY and KING, Circuit Judges.

REAVLEY, Circuit Judge:

The Federal Deposit Insurance Corporation ("FDIC") sued Henry Blanton to recover the unpaid balance of a $965,000 promissory note (the "Note") executed by co-makers Blanton and Gihls Properties, Inc. ("Gihls"), and secured by liens on securities and real estate upon which the FDIC had foreclosed. Blanton's various defenses concerned the FDIC's disposition of the collateral. The district court credited Blanton with some items pursuant to jury findings, but awarded the FDIC a deficiency judgment of $510,981.20.

Blanton argues on appeal that he should be fully discharged from all liability on the Note because of defects in the FDIC's disposition of the collateral securing the Note and because of an accord and satisfaction between the parties. He also objects to the district court's refusal to abate the proceedings pending disposition of the FDIC's claim against Gihls in a Florida bankruptcy court, and the court's rejection of the jury finding that the FDIC sold one tract of real estate for a grossly inadequate price. Blanton further disputes the district court's calculation of prejudgment interest on the Note. We affirm the district court's judgment.

## I. FACTS

Blanton executed the Note both in his individual capacity and as president of Gihls, in which he owned 99 percent of the stock. The $965,000 Note—in renewal, extension, and modification of two promissory notes previously executed by Gihls—was payable to First National Bank of Midland (FNB–Midland), and secured by first liens on certain publicly traded stocks and bonds and tracts of real estate.

The Note matured on September 30, 1983. The Comptroller of the Currency declared FNB–Midland insolvent and closed the bank on October 14, 1983. Gihls, the co-maker of the Note and maker of the original notes, filed a petition in bankruptcy on August 30, 1985. Blanton and the FDIC conducted negotiations to rework the debt, and the parties disputed whether these negotiations ripened into an accord and satisfaction.

Without notifying Blanton, the FDIC sold the securities on the New York Stock Exchange and the New York Bond Exchange between August 25, 1987 and December 1, 1987, although Blanton had first requested that the FDIC sell the securities as early as October 1983. The FDIC realized an aggregate price for the securities equivalent to their value at the time Blanton first instructed the FDIC to sell them. The FDIC applied the proceeds from the sales to the Note in late 1987.

The real properties securing the Note were sold at Substitute Trustee's sales conducted in Midland and Ector counties on September 1, 1987. The FDIC credited proceeds exceeding $372,000 to the Note on that day.

The FDIC filed suit for a deficiency judgment against Blanton on October 7, 1987. The jury found (1) that Blanton effectively communicated to the FDIC an instruction to sell the securities in October 1983, and that the FDIC's failure to sell the securities until 1987 was neither reasonable nor justified; (2) that Blanton, Gihls, and the FDIC had not entered into a settlement contract; (3) that Blanton presented to the FDIC a buyer ready, willing, and able to purchase two of the real properties, but that the FDIC did not consent to the sales; and (4) that there were defects in the foreclosure sales of all five real properties, and that these defects contributed to grossly inadequate sales prices for the properties.

The district court entered a deficiency judgment in the FDIC's favor for $510,-981.20 plus interest at the rate of $130.73 a day from May 12, 1988 until June 6, 1988, with interest accruing thereafter at 7.2 percent.

Based on the jury finding of the FDIC's unreasonable delay in selling the securities,

the court found impairment of the collateral and accordingly credited Blanton with the market value of the securities, minus a two percent commission, on November 18, 1983. The court declined to discharge Blanton from the entire debt, finding no evidence that the FDIC failed to give notice of the sale of securities in a commercially reasonable manner or that the FDIC elected to retain the collateral in full satisfaction of the debt.

Based on the jury findings with respect to the real property foreclosures, the court credited Blanton for the fair market value of four of the properties, as determined by the jury, rather than the amount of the sales proceeds obtained by the FDIC. With respect to one of the five properties, however, the court entered judgment notwithstanding the verdict, disregarding the jury finding of a "grossly inadequate price," because the FDIC realized 62.3 percent of the fair market price. The court credited Blanton for the actual sales price of this property.

Blanton argues primarily that he should be fully discharged from all liability on the Note because the FDIC failed to notify him of the sale of securities, because of other defects in the FDIC's disposition of the collateral, and because of the alleged accord and satisfaction between the parties.

## II.  DISCUSSION

### A.  Lack of Notice

██  While a creditor may dispose of collateral securing a defaulted debt by private or public sale, every aspect of the disposition must be conducted in a commercially reasonable manner. TEX.BUS. & COM.CODE ANN. § 9.504(c) (Tex. UCC) (Vernon Supp. 1990). Compliance with section 9.504(c) requires the creditor to provide notice of a sale, subject to certain exceptions.[1] Blanton contends that the FDIC failed the notice requirement and seeks to bar the FDIC from any recovery under the rule of *Tanenbaum v. Economics Lab., Inc.*, 628 S.W.2d 769, 772 (Tex.1982) (barring deficiency suits of creditors who fail to comply with the notice requirements of section 9.504(c)). This case does not trigger the *Tanenbaum* rule.

██  The district court found that there "was no evidence that FDIC failed to give notice in a commercially reasonable manner pursuant to Section 9.504(c)."[2] Blanton instructed the FDIC to sell the securities, but apparently did not receive notice of the sales. The FDIC argues that the sales were valid without notice because the securities were collateral "of a type customarily sold on a recognized market," which section 9.504(c) exempts from the notice requirement. We agree.

The notice requirement allows the debtor to bid on the collateral or otherwise insure a commercially reasonable sale. *Beltran v. Groos Bank*, 755 S.W.2d 944, 947 (Tex. App.—San Antonio 1988, no writ). A recognized market assures a fair price through neutral market forces, and thus

---

1. The notice requirements of section 9.504(c) provide in relevant part: "Unless collateral is perishable or threatens to decline speedily in value *or is of a type customarily sold on a recognized market*, ... reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale." (Emphasis added.)

2. Blanton argues that the district court incorrectly placed the burden of proof on Blanton to prove deficient notice. The proper burden of proof is unsettled in Texas. The rule placing the burden of proving a commercially reasonable disposition of collateral on the secured party was first adopted in Texas by *Sunjet, Inc.*

*v. Ford Motor Credit Co.*, 703 S.W.2d 285, 287 (Tex.App.—Dallas 1985, no writ). *But see Folkes v. Del Rio Bank & Trust Co.*, 747 S.W.2d 443, 445 (Tex.App.—San Antonio 1988, no writ) (failure to dispose of collateral in commercially reasonable manner is an affirmative defense). The most recent case addressing this issue, *Greathouse v. Charter National Bank–Southwest*, 795 S.W.2d 1, 2–3 & n. 2 (Tex.App.—Houston [1st Dist.] 1990, writ requested), places the duty of pleading on the debtor and the burden of proof on the creditor. Although the Texas Supreme Court has not yet settled the issue, the trend appears to be toward placing the burden of proof on the creditor. As established in the text, however, the FDIC met whatever burden may exist by establishing the inapplicability of the section 9.504(c) notice requirements.

obviates the debtor's need for protection through redemption, appraisal, or monitoring the sale. *See M.P. Crum Co. v. First Southwest Sav. & Loan Ass'n,* 704 S.W.2d 925, 927 (Tex.App.—Tyler 1986, no writ) (indicia of recognized market: nonexistent or immaterial differences of items sold, insignificance of competition as factor in each sale, and availability of quotations for prices paid in actual sales of comparable property).

Section 9.504(c) does not define "recognized market," but the markets at issue here—the New York Stock Exchange and the New York Bond Exchange—comfortably fit the paradigm. Courts treat the term "recognized market" restrictively, but universally agree that securities markets properly fall within the exception. *See id.* (contrasting clear case of stock or commodity market with home mortgages market at issue); *Washburn v. Union Nat. Bank & Trust,* 151 Ill.App.3d 21, 104 Ill.Dec. 242, 245–46, 502 N.E.2d 739, 742–43 (1986) (affirming summary judgment for creditor on commercial reasonableness of sale of Ginnie Mae bonds without notice to debtor); *Ocean Nat. Bank of Kennebunk v. Odell,* 444 A.2d 422, 425–26 (Me.1982) (notice unnecessary for listed securities). Authoritative commentary dispatches the issue directly: "Certainly, the New York Stock Exchange and the bond and commodity markets are 'recognized markets.' " J. White & R. Summers, *Uniform Commercial Code* § 26–10 at 1111 (2d ed. 1980).

■ The sale of the securities in a recognized market eliminates the concerns on behalf of the debtor expressed in *Tanenbaum.* The creditor in *Tanenbaum* scrapped the collateral without notice to the debtor, and then sued for deficiency minus the scrap value of the collateral. 628 S.W.2d at 770. The court held that by destroying the collateral, thus precluding any possibility of appraising it, the creditor

effectively retained the collateral in full satisfaction of the debt pursuant to section 9.505(b), and that a creditor's suit for deficiency after disposition of collateral requires compliance with the notice provisions of section 9.504(c). *Id.* at 772. The debtor in *Tanenbaum* asked the creditor to take back the collateral in full satisfaction of the debt. *Id.* Blanton instructed the FDIC to sell the securities, knowing that the proceeds would nowhere near approach the balance on the Note. He adduces nothing to suggest that the FDIC elected to retain the collateral in full satisfaction of the debt, or that his legitimate interest in the value of the collateral was impaired by failure of actual notice.[3]

■ Blanton argues that even if the recognized market exception applies, at least one of the securities—the LTV debenture— did not have such a market. The record indicates a thin market for that security because LTV had filed for Chapter 11 relief under the Bankruptcy Code. But we do not read the recognized market exception to contemplate involuntary strict foreclosure unless the creditor analyzes the popularity of a listed security. A recognized market need not be a robust market. It is the neutral market structure of the Exchange, not the popularity of the security, that excuses a creditor from the notice requirement. For the LTV debenture, as with the other securities, someone entered a sale order in the usual manner and the security sold. *See* Tex.Bus. & Com.Code Ann. § 9.507(b) (Tex. UCC) (Vernon Supp. 1990) (sale of collateral in the usual manner in any recognized market deemed a commercially reasonable disposition). Blanton does not suggest any viable alternative market. We reject his plea for discharge.

*B. Commercial Reasonableness of Sale*

■ The district court refused to submit a special interrogatory on the commercial

---

**3.** Blanton claims that the Security Agreement imposes an express notice obligation independent of section 9.504(c). The Agreement does stipulate a ten-day notice period, but expressly excepts notice periods governed "by the Statutes of the State of Texas." The "recognized market" provision of section 9.504(c) governs notice in

this case, and we construe the Security Agreement to impose no notice obligation beyond the statutory exemption. Nor, in any event, do we believe that Texas courts would apply the *Tanenbaum* discharge rule to incidental violation of a private notice arrangement that did not prejudice the debtor.

reasonableness of the sale of securities. As noted above, Texas law establishes that the sale of collateral on a recognized market is commercially reasonable. TEX.BUS. & COM.CODE ANN. § 9.507(b). On that basis, the district court presumably deemed the sale of securities commercially reasonable as a matter of law. A party is entitled to an instruction only on claims supported by some evidence. *Neubauer v. City of McAllen*, 766 F.2d 1567, 1575 (5th Cir.1985). Blanton introduced no evidence to dispute the sale of the securities on a recognized market in the usual manner.

The jury did find that the FDIC's failure to sell the securities at the time that Blanton instructed FDIC to do so was unreasonable. The district court interpreted this finding as an impairment of collateral and credited Blanton accordingly. Before us then is a peculiar hybrid: a commercially reasonable disposition of collateral impaired by an unreasonable delay in disposition. But the concept of commercial reasonableness subsumes the method, manner, time, place, and terms of the collateral's disposition. *Texas Nat. Bank v. Karnes*, 711 S.W.2d 389, 392 (Tex.App.—Beaumont), *aff'd in part, rev'd in part on other grounds*, 717 S.W.2d 901 (Tex.1986) (per curiam). Finding an *unreasonable* delay in selling the securities implicates, linguistically and logically, the commercial *reasonableness* of the sale.

Nevertheless, the district court's refusal to submit a special interrogatory on the commercial reasonableness of the disposition does not affect the outcome of this case. First, the district court had an adequate basis to deem, as a matter of law, every aspect of the sale commercially reasonable except for the delay in selling the securities. The jury did receive and an-swer an interrogatory on the issue of delay. Submission of that issue addressed the only fact issue concerning the reasonableness of the disposition, and Blanton cannot complain of the court's failure to submit to the jury issues properly dispatched as a matter of law.

Second, whether the district court addressed the delay as an issue of impairment or of commercial unreasonableness, the result would not change. Blanton falls short of facts entitling him to complete discharge. If delaying the sales constituted commercial unreasonableness, such delay would entitle Blanton to a credit for the fair market value at the time the securities should have been sold. *See Piney Point Investment Corp. v. Photo Design, Inc.*, 691 S.W.2d 768, 770 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) (proper crediting at time collateral should have been sold gives debtor everything to which he would be entitled had collateral been sold at commercially reasonable time). The *Piney Point* court properly distinguished *Tanenbaum* because *Tanenbaum* concerned the debtor's inability to appraise collateral destroyed by the creditor. *Id.* The FDIC did not elect to retain the collateral in full satisfaction of the debt, and the record does not warrant presuming such an election as a matter of law.[4]

Blanton does not argue that the FDIC failed to realize the quoted market price for the securities. Nor is there evidence that the aggregate value of the securities declined between the time that Blanton instructed the FDIC to sell the securities and the time the FDIC actually sold the securities. The credit Blanton received for the delay in selling the securities (essentially, a reduction in interest due) adequately redressed whatever unreasonableness may have attended the FDIC's delayed disposi-

---

**4.** Blanton cites to *Karnes*, 711 S.W.2d at 392, for the proposition that a commercially unreasonable disposition entitles him to complete discharge. That case is distinguishable. The creditor-bank in *Karnes* repossessed a van, kept it for five years, and had still not disposed of it at the time of trial. A deficiency judgment was not at issue; the bank had fraudulently removed the balance due on the note from the savings account of the debtor's mother, who had co-signed the note and subsequently brought suit for conversion of the sum taken from her account. The facts in *Karnes* that triggered the *Tanenbaum* rule do not justify its extension here. The FDIC sold the securities and realized an amount equivalent to what would have been realized had the securities been sold immediately upon Blanton's instruction to do so. In the interim, the securities continued generating dividends, in contrast to the "depreciation factor" noted by the *Karnes* court with respect to vehicles.

tion of the securities. Absent any legal basis for complete discharge, the failure to submit an interrogatory concerning commercial reasonableness did not prejudice Blanton.

### C.  Impairment of Collateral

#### 1.  The Securities.

■  The jury found that the FDIC's failure to act timely upon Blanton's instruction to sell the securities was unreasonable. The district court then held that this delay impaired the securities within the meaning of TEX.BUS. & COM.CODE ANN. § 3.606(a)(2) (Tex. UCC) (Vernon 1968). The court accordingly credited Blanton for the market value of the securities, $73,065.37, less a two percent commission,[5] as of November 18, 1983. Because the aggregate value of the securities had not significantly changed in the interim, the credit did not affect the principal due on the Note, but did effectively relieve Blanton from the accumulation of interest on $73,065.37 between November 18, 1983 and late 1987 when the FDIC actually sold the securities. Blanton expresses dissatisfaction with the credit and seeks a full discharge. We reject his discharge argument.

The FDIC's delay in selling the securities did not diminish the value of the collateral and did not otherwise increase Blanton's risk under the Note. We find no precedent for designating a delay of this type an "impairment" under section 3.606. We nevertheless assume without deciding that the district court properly found an "impairment" rather than a commercially unreasonable disposition. Under either rubric, the court's credit gave Blanton everything to which he was entitled.[6]

Section 3.606(a) bars recovery from a *surety* who establishes impairment of collateral. Blanton claims that he is an accommodation maker, but the district court made no finding regarding his status and Blanton fails to support his contention by evidence or law. One presumptively signs as a co-maker unless a suretyship relationship between co-signers appears on the face of the note. *Caldwell v. Stevenson*, 567 S.W.2d 278, 280 (Tex.Civ.App.—Austin 1978, no writ). Specifically, a stockholder who signs a corporate promissory note derives substantial benefit and good consideration and "cannot claim to be an accommodation endorser or maker." *Wortham v. Lake Jackson State Bank*, 435 S.W.2d 612, 613 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.) (finding ample consideration for extension and renewal of corporate note where endorser owns at least 50% of stock). Blanton owns 99% of the stock in Gihls. He bears the burden of proving his status as an accommodation party. *Caldwell*, 567 S.W.2d at 280. He failed to do so and cannot now prevail under this theory. *Crimmins v. Lowry*, 691 S.W.2d 582, 586 (Tex.1985) (Ray, J., concurring). Nor did he offer any proof concerning the scope of his recourse, if any, against his own bankrupt company. *See id.* at 585. The district court credited Blanton to the extent of the impairment and certainly did not err in failing to discharge Blanton from the entire debt. *See id.* at 585–86.

#### 2.  The Properties.

■  Blanton additionally argues that the FDIC impaired collateral by refusing to

---

**5.**  Blanton disputes the propriety of deducting a two-percent commission from $73,065.37 because that figure represents the net value of the portfolio on November 18, 1983, *after* a two-percent commission. The record confirms Blanton's observation. We have only the district court's bottom-line calculation, not its computations. We must assume that the court did not intend a double deduction for the two-percent commission, and that the phrase, "less a two percent commission," simply highlighted the propriety of including the commission in its calculation.

**6.**  Had the FDIC appealed, a closer examination of the proper calculation might have reduced Blanton's credit. The district court credited Blanton with the fair market value of the securities as of November 1983, thus relieving him of accumulated interest on the value of the securities for four years. During that four years, however, he continued to receive dividends on the securities. Were we *forced to consider*, pursuant to an FDIC appeal, whether Blanton's credit should then be debited by the amount of the dividends he would not have received, his credit might appear more like a windfall than a basis for complaint.

release its lien on two properties when Blanton presented ready and willing buyers, thereby breaching an alleged duty of good faith. The Texas Supreme Court recently reversed a case cited by Blanton for the proposition that the FDIC owes such a duty of good faith. *Coleman v. Federal Deposit Ins. Corp.*, 762 S.W.2d 243 (Tex. App.—El Paso 1988), *rev'd*, 795 S.W.2d 706 (Tex.1990).

The *Coleman* court rejected the precise claim advanced by Blanton in this case, and specifically noted that the "FDIC had no federal common law duty to foreclose its lien expeditiously." 795 S.W.2d at 709. Blanton cites nothing further to establish the FDIC's duty to release the liens, and nothing to counter the upshot of *Coleman*. We reject Blanton's claim of impairment of the properties.

## D. Defects in Foreclosure Sales

█ The jury found defects in the foreclosure sales of the five properties that provided additional security for the Note. The jury further found that these foreclosure defects contributed to the sale of each property at a grossly inadequate price. The district court accordingly credited Blanton with the fair market value of four of the properties—$816,600.90—rather than the actual sales price of $372,228.06. Dissatisfied with the credit, Blanton repeats his demand for a full discharge, but cites nothing except *Tanenbaum* entitling him to such relief.

Blanton could have sought to invalidate the sale, *see Savers Federal Savings & Loan Ass'n v. Reetz*, 888 F.2d 1497, 1503 (5th Cir.1989), but declined to do so. His remaining alternative was to take a credit for the fair market value of the property. *See Charter National Bank–Houston v. Stevens*, 781 S.W.2d 368, 375 (Tex.App.— Houston [14th Dist.] 1989, writ denied); *Farrell v. Hunt*, 714 S.W.2d 298, 299 (Tex.

1986). The district court properly credited Blanton. No further relief is warranted.

Blanton impermissibly broadens *Tanenbaum* to support his claim of discharge. *Tanenbaum* interprets the statutory rules governing disposition of personal property. An entirely separate statutory framework governs disposition of real property. *See Reetz*, 888 F.2d at 1507–08 n. 14. We honor the basic factual context of *Tanenbaum*, and absent a clear directive in Texas law, we do not find in *Tanenbaum* a broad philosophy of debt relief suitable for debtors in widely divergent circumstances.

## E. Gross Inadequacy of Sales Price

█ The jury found that all five properties were sold at a grossly inadequate price. The district court accordingly credited Blanton with the fair market value of four of the properties, but granted judgment notwithstanding the verdict as to one—the parcel consisting of 14 single family lots—and credited Blanton only with the actual sales price. Blanton claims error and seeks a credit for the fair market value of the 14 single family lots. We will not disturb the trial court's ruling.

The district court properly instructed the jury that a grossly inadequate price would have to be so little as "to shock a correct mind, and thereby raise a presumption that fraud attended the purchase." *Richardson v. Kent*, 47 S.W.2d 420, 425 (Tex.Civ. App.—Dallas 1932, no writ). The jury was apparently shocked. The judge, relying on Texas precedent, found the sales price— 62.3% of the market price—legally short of shocking.

Given the inexactitude of real estate appraisal, the variability of market conditions affecting value, and the necessary imprecision of guidance for the factfinder, a jury finding of "grossly inadequate price" sometimes oversteps legal limits. The weight of Texas authority rejects a determination of gross inadequacy where, as here, property sells for over 60% of fair market value,[7]

---

7. We certainly do not promote mechanical application of a "60% test," but we conclude that the district court's application of these flexible guidelines properly redressed the unfairness to the FDIC in this case. Cases with a finding of

gross inadequacy typically fall far below the 60% line. *See Stevens,* 781 S.W.2d at 373 n. 1 (citing cases finding gross inadequacy when sales price is a tiny fraction of value). Blanton's single contrary citation is this circuit's

and precedent exists for disregarding a jury finding to the contrary. *Citizens National Bank of Lubbock v. Maxey*, 461 S.W.2d 138, 143 (Tex.Civ.App.—Amarillo 1970, writ ref'd n.r.e.) (sale of stocks for over 60% of market value not grossly inadequate despite contrary jury finding).

### F. Interest Rate on the Note

Blanton disputes the district court's calculation of postmaturity prejudgment interest on the note, claiming at best an incorrect determination and at worst a usurious rate.[8] The court made no specific findings with respect to interest, but in granting the FDIC a deficiency judgment, the court awarded interest at the rate of $130.73 a day from May 12, 1988 until June 6, 1988 (the date of judgment), with interest accruing thereafter at 7.2 percent. Computations based on the judgment apparently put the court's assessment of prejudgment interest at ten percent, and the parties briefed accordingly.

■ Blanton argues first that the applicable *post*maturity rate should be one percent because the contract specifies a *pre*maturity rate equal to FNB–Midland Prime plus one percent, and upon FNB–Midland's insolvency, FNB–Midland Prime evaporated, leaving one percent. Even assuming the absence of a specific agreement as to postmaturity interest, settled Texas law permits the implication that the specified prematurity rate continues after maturity. *Petroscience Corp. v. Diamond Geophysical, Inc.*, 684 S.W.2d 668, 668–69 (Tex.1984) (per curiam). Such an implication favors continuity in the rate of interest rather than elimination of interest upon the unforeseeable insolvency of the bank supplying the prime rate reference.

■ Alternatively, Blanton denies the existence of any agreement on postmaturity interest and urges a legal rate of six percent based on the Texas statute governing applicable interest in the absence of agreement between the parties. TEX.REV. CIV.STAT.ANN. art. 5069–1.03 (Vernon 1987).[9] We find article 5069–1.03 inapplicable. We conclude either that the parties did agree on a specific postmaturity rate, or that the evidence was such that the district court could properly fix the interest without reference to article 5069–1.03.

We reiterate the settled law that a specific prematurity interest rate continues after maturity when the contract is silent as to postmaturity interest. *Petroscience*, 684 S.W.2d at 668–69. This proposition alone lifts this Note out of the six-percent statute. A specific interest agreement persisted after maturity, even if the calculation varied.

The trial judge could have applied an analogous prime rate as consistent with the intent of the parties.[10] His decision to ap-

---

controversial opinion in *Durrett v. Washington Nat. Ins. Co.*, 621 F.2d 201 (5th Cir.1980). The *Durrett* court suggested that a bankruptcy trustee or debtor-in-possession could avoid a nonjudicial foreclosure sale if the property sold for less than 70% of its fair market value. *Id.* at 203–04. The policies informing construction of 11 U.S.C. § 548(a)—which allows trustees to set aside as fraudulent conveyances transfers for "less than a reasonably equivalent value"—do not assist the disposition of this case. Interestingly, bankruptcy courts frequently cite *Durrett* for the "70% test" based on its dicta. *See, e.g., Willis v. Borg–Warner Acceptance Corp.*, 48 B.R. 295, 300–01 (Bankr.S.D.Tex.1985). But on the facts actually before the *Durrett* court, it held only that 57.7% of market value does not constitute reasonably equivalent value. 621 F.2d at 204.

**8.** We do not address the requirements for a claim of usury because we concur with the district court's calculation of interest, and reject

Blanton's claim that 6% was the legal limit. Moreover, the Note specifies the intent of the parties to comply with the usury laws and provides specific mechanisms by which any excess charges will be handled to so comply.

**9.** Article 5069–1.03 provides: "When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable."

**10.** As if the interest issue were insufficiently interesting, confusion compounded during oral argument. Counsel for FDIC indicated that the district court had not in fact applied a uniform 10% rate, but instead applied a fluctuating rate borrowed from the prime rate of Republicbank, the assuming bank of FNB–Midland. FDIC asserted that this information was mathematically

ply a ten percent rate implies a finding that the parties agreed to that rate. The record suggests an adequate basis for that implied finding and we do not disturb it. Blanton's own affidavit included the Note as an exhibit, the first page of which constitutes the envelope-face of the Note and clearly provides that "[a]ll past due principal and interest shall bear interest at the rate of ten per cent per annum from maturity until paid."

What appeared clear at trial became confused on appeal. At oral argument, counsel for Blanton argued that the language providing for postmaturity interest at ten percent appears only on the unsigned envelope which he contended was not offered into evidence.[11] The district court did in fact have the envelope-face of the Note before it—as an attachment to a bankruptcy Proof of Claim—and Blanton acknowledged the face as part of the Note in his affidavit. The district court could assess the intent of the parties accordingly and we do not disturb that assessment.

### G. Existence of a Settlement Agreement

■ The jury found that the parties had not entered into an accord and satisfaction and the district court refused to enter a finding to the contrary. The record provides a reasonable basis for the jury's finding.

Prior to the foreclosure sales, Blanton attempted to settle his debt. Negotiations were conducted between Bob Dutton, an accountant who represented Blanton, and Rodney Bailey, an FDIC official assigned to the Blanton account. Although Bailey himself apparently viewed Blanton's proposal favorably, he testified that FDIC never approved the offer. Such approval was

essential before the proposal could become a settlement contract, and Dutton was so advised in writing.

Dutton testified that Bailey told him the settlement had been approved. Bailey testified that the FDIC never approved the settlement, and that he never advised Dutton of FDIC's approval. No other evidence indicates FDIC approval of the settlement. The jury weighed the conflicting testimony and found that the FDIC had not entered into a settlement contract with Blanton. The trial court did not disturb the jury's finding; nor will we.

### H. Motion to Abate

■ Blanton claims that the district court should have abated this action pending a Florida bankruptcy court's disposition of Gihls' objection to FDIC's proof of claim. Blanton filed a motion to abate, arguing that this action and the Gihls Chapter 11 proceedings were based on the same promissory note. The district court denied the motion. We review the district court's decision on Blanton's plea in abatement for abuse of discretion. *Continental Casualty Co. v. McAllen Indep. School Dist.*, 850 F.2d 1044, 1047 (5th Cir.1988) (per curiam).

Blanton argues that the district court abused its discretion because failure to abate resulted in (1) awarding FDIC a double recovery; and (2) depriving Blanton of a res judicata defense that "could have been applied to prevent FDIC from asserting a claim in excess of $152,918.47 against Blanton." We reject both contentions.

After the district court's decision, the Gihls bankruptcy court issued an order that entitles FDIC to an unsecured claim against Gihls for $305,836.97. Under the

---

determinable through information in the record but required complex computations. We modestly decline to duplicate these computations, and instead base our holding on the argument that the parties briefed. Application of the fluctuating rate would merely indicate that the trial judge had not accepted the ten percent postmaturity interest agreement, and had instead applied a prime rate borrowed from larger Texas banks upon which FNB–Midland had based its own prime rate. The Florida bankruptcy court presiding over the Gihls Properties proceedings did precisely that, and expressly rejected application of the Texas six-percent legal interest statute.

11. The envelope-face of the Note was in fact proved, though not as part of an exhibit entitled "Promissory Note." A Gihls bankruptcy Proof of Claim included the envelope-face as Exhibit A. During cross-examination of an FDIC witness, counsel for Blanton referred to this Exhibit A, which included the envelope-face, as "the promissory note in issue in this case."

Gihls Plan of Reorganization, the FDIC will receive $152,918.50, payable over five years in equal annual installments. Blanton claims "double recovery" and wants $152,918.50 deducted from his personal liability to FDIC. But Blanton and Gihls are co-makers and therefore jointly and severally liable for full payment on the Note. *Caldwell*, 567 S.W.2d at 280. *See* TEX.BUS. & COM.CODE ANN. § 3.118(5) (Tex.UCC) (Vernon 1968); *see also Estrada v. River Oaks Bank & Trust Co.*, 550 S.W.2d 719, 729 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.) (second defendant contended he was surety and asserted offset based on unsatisfied judgment against first defendant, but face of note reflected status as co-makers, subjecting both to joint and several liability on the obligation). While the FDIC cannot obtain more than one satisfaction of the Note, it may obtain judgments on the Note against both Gihls and Blanton based on their joint and several liability. *State Savings & Loan Ass'n of Lubbock v. Liberty Trust Co.*, 863 F.2d 423, 427 (5th Cir.1989).

Blanton also contends that the bankruptcy court award of $152,918.50 on an allowed claim of $305,836.97 should, under the doctrine of res judicata, limit FDIC's recovery here to the amount of the allowed claim that remains unsatisfied: $152,-918.47. Blanton's argument is without merit.

The question before the Gihls bankruptcy court involved the applicable rate of interest on the Note prior to petition filing. The court did not adjudicate Blanton's liability on the Note, nor in fact could it do so. The Bankruptcy Code provides that "discharge of a debt of the debtor does not affect the liability of any other entity on … such debt." 11 U.S.C. § 524(e). Thus any "discharge in bankruptcy is personal to the bankrupt and does not have the effect of canceling or releasing the liability of a person jointly liable for a debt." *Swinford v. Allied Finance Co. of Casa View*, 424 S.W.2d 298, 302 (Tex.Civ.App.—Dallas, writ dism'd w.o.j.), *cert. denied*, 393 U.S. 923, 89 S.Ct. 253, 21 L.Ed.2d 259 (1968); *see also United States v. Stribling Flying Service, Inc.*, 734 F.2d 221, 223 (5th Cir.

1984) (reduction of corporate debt in Chapter 11 proceedings did not affect obligation of guarantors on original debt). The two proceedings adjudicated different issues, and the district court correctly denied Blanton's motion to abate.

The judgment of the district court is AFFIRMED.