# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00539-CV

**Robert E. Tesch, Appellant**

**v.**

**Equity Secured Capital, L.P., Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 419TH JUDICIAL DISTRICT
### NO. D-1-GN-12-000105, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Equity Secured Capital, L.P. (ESC) sued Robert E. Tesch for deficiencies resulting from two foreclosure sales conducted after Tesch failed to make payments when due on two promissory notes. After a bench trial, the district court awarded ESC judgment for the deficiencies from both foreclosures. On appeal, Tesch argues that the court erred by denying his counterclaim for wrongful foreclosure, declining to require ESC to make an election of remedies, imposing an illegal contractual penalty against him, and awarding ESC a deficiency judgment on the second foreclosure. We will affirm the district court's judgment.

## BACKGROUND

The dispute between Tesch and ESC arises from two loan transactions. In the first transaction, Tesch borrowed $750,000 from ESC for cash for his business. Tesch secured repayment of this loan by executing a note and deed of trust secured against a 17.825-acre tract of real property

(the Tract) that Tesch owned in Williamson County. The parties subsequently agreed to extend the maturity date of the note.

After that extension, Tesch defaulted by failing to make the required payments when due and did not cure the default. When Tesch stopped making payments on the note, he owed ESC approximately $808,203.80. ESC appointed a substitute trustee, who initiated foreclosure proceedings under the terms of the deed of trust and sold the Tract to ESC at foreclosure in 2011 for $505,000. The sale resulted in a $303,203.80 deficiency between the amount Tesch owed on his note and the amount the Tract brought at the foreclosure sale.[1]

Tesch's uncured default and ESC's foreclosure in the first transaction led to the parties' second transaction, in which Tesch borrowed $650,000 from ESC without any down payment—i.e., a 100% seller-financed transaction—as purchase money for reconveyance of the Tract to him. In this second transaction, the parties executed three documents: a second note; a second deed of trust secured against the Tract; and a "Tolling, Standstill, and Reconveyance Agreement." In the Tolling Agreement, ESC retained its deficiency claim under the first note and the parties agreed to toll time-related defenses for claims and counterclaims they would have against each other. Specifically, the Tolling Agreement acknowledged ESC's demand to Tesch for $808,203.80 of "Claims,"[2] but stated that ESC would forego its Claims under the first note as "a contingent accord

---

[1] The interest on the first note's deficiency balance of $303,203.80 was $118,876.35 as of the date of trial, for a total of $422,080.15.

[2] The "Claims" included the $775,786 principal balance on the first note "as modified, renewed and extended"; $29,835.44 of interest; $832.36 of late fees; and $1,750.00 of legal fees. ESC also made a demand for the deficiency as part of its Claims, although Tesch disputed the deficiency amount: "Tesch disputes the amount of the deficiency for which demand has been made as part of the Claims of ESC under the Original Note."

and satisfaction" if Tesch fully satisfied his obligations under the second note, second deed of trust, and the Tolling Agreement. The effect of these documents, which we will address in our discussion of Tesch's appellate issues, are the basis of the parties' dispute.

After Tesch's uncured default for failure to make payments when due on the second note, ESC again appointed a substitute trustee, who initiated foreclosure proceedings under the terms of the second deed of trust and sold the Tract to ESC at foreclosure in 2012 for $400,000. As of the date of foreclosure—and excluding the amounts owed from the first default—Tesch owed ESC approximately $671,412.50 consisting of the $650,000 principal balance on the second note, $18,850 of interest, $812.50 of late fees, and $1,750.00 of legal fees. The second foreclosure sale resulted in a $271,412.50 deficiency between the amount Tesch owed on his second note and the amount the Tract brought at the foreclosure sale.[3]

ESC filed "suit on the note/breach of contract" claims against Tesch for his defaults on the two promissory notes resulting in the two post-foreclosure deficiencies. Tesch answered, alleging that ESC was not entitled to conduct the second foreclosure because it had executed a Transfer of Lien assigning Tesch's second note and second deed of trust to PlainsCapital Bank before the second foreclosure sale.[4] Tesch sought a determination of the fair market value of the Tract as of the date of the second foreclosure, a declaration that ESC lacked standing to conduct the second foreclosure, and damages or recission of the second foreclosure sale on his counterclaim for wrongful foreclosure.

---

[3] The interest on the second note's deficiency balance of $271,412.50 was $57,689.35 as of the date of trial, for a total of $329,101.85.

[4] Tesch's live pleadings specifically define the complained-of "Foreclosure" as the "foreclosure sale [ESC] conducted on or about January 3, 2012" (the second foreclosure).

ESC pledged Tesch's second note and second deed of trust to the Bank as security for ESC's line of credit and as required by a preexisting Security Agreement between the Bank and ESC. At the subsequent bench trial, ESC argued that the transfer to the Bank was not an absolute assignment and did not deprive ESC of the right to conduct the foreclosure but was a collateral transfer to the Bank of ESC's interest in Tesch's second note and second deed of trust.

The district court signed a final judgment about two months later awarding ESC $772,718.86 for the post-foreclosure-sale deficiencies and interest on both of Tesch's notes and denying Tesch's counterclaim for wrongful foreclosure. Tesch filed a motion for new trial and an untimely request for findings of fact and conclusions of law, both of which the court denied. This appeal followed.

**DISCUSSION**

Tesch contends that the district court erred by: (1) denying Tesch's counterclaim for wrongful foreclosure; (2) imposing an illegal contractual penalty against him and declining to require ESC to make an election of remedies; and (3) awarding ESC a deficiency judgment on the second foreclosure. We consider each of these arguments below.

**Standard of review**

Because the district court did not make findings of fact and conclusions of law after the bench trial, we presume that the court made every finding necessary and supported by the evidence in favor of its judgment. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). In determining whether some evidence supports the judgment and the implied findings of fact, "'it is proper to consider only that evidence most favorable to the issue and to disregard entirely that which

is opposed to it or contradictory in its nature.'" *Id*. (quoting *Renfro Drug Co. v. Lewis*, 235 S.W.2d 609, 613 (1950)). We must affirm the judgment if it can be upheld on any legal theory that finds support in the evidence. *Id*.

**Wrongful-foreclosure counterclaim**

In his first issue, Tesch argues that the district court erred by denying his wrongful-foreclosure counterclaim because ESC lacked standing to conduct the foreclosure. Tesch points out that ESC executed a Transfer of Lien assigning his second note and second deed of trust to PlainsCapital Bank before the second foreclosure sale occurred. A wrongful-foreclosure claim requires proof of: (1) a defect in the foreclosure sale proceedings, (2) a grossly inadequate selling price, and (3) a causal connection between the defect and the grossly inadequate selling price. *Charter Nat'l Bank-Hous. v. Stevens*, 781 S.W.2d 368, 371 (Tex. App.—Houston [14th Dist.] 1989, writ denied). Here, Tesch challenges only the first element, that the foreclosure sale proceedings were defective because of ESC's alleged lack of standing.

ESC responds that the transfer to the Bank was not an absolute assignment but a collateral transfer of its interest in Tesch's second note and second deed of trust, which were pledged to the Bank as security for ESC's line of credit and as required by a preexisting Security Agreement between the Bank and ESC. ESC points to authorities noting that an assignment or transfer that appears absolute can be shown by parol evidence to be intended only as collateral security. *See Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 556 (Tex. 1986); *Hillcrest State Bank v. Bankers Leasing Corp. of Tex.*, 544 S.W.2d 727, 728 (Tex. Civ. App.—Dallas 1976, writ ref'd n.r.e.); *see also Garner v. East Tex. Nat'l Bank of Palestine*,

608 S.W.2d 939, 941-43 (Tex. App.—Tyler 1980, writ ref'd n.r.e.) (citing *Thigpen v. Locke*, 363 S.W.2d 247 (Tex. 1962) and concluding that trial court properly considered testimony from bank's president and another witness in determining whether transfer of lien appearing absolute on its face was actually intended to create only security interest).  We agree.

The Bank's executive vice-president Frank Jackel testified that the Bank required security for its line of credit to ESC; that the collateral consisted of "specified notes, receivables secured by real property"; and that Tesch's $650,000 note to ESC was one of the notes that was collateral for the Bank's loan.  Jackel further testified that as part of the loans to ESC, the Bank required that ESC sign transfers of liens in connection with the underlying notes.  Jackel explained that the purpose of the lien transfer was to perfect the Bank's interest in, and notify the public of, the Bank's security interest in that note receivable.  But Jackel denied that the Bank ever purchased a note from ESC or claimed to own anything more than a collateral interest in ESC's notes.

ESC's President Vincent DiMare also testified about ESC's line of credit with the Bank, explaining that when a note that ESC had pledged as collateral to the Bank became ineligible as collateral because it was delinquent or ESC had to foreclose on it, the Bank would transfer the note back to ESC.  DiMare testified that such was the case in December 2011 with Tesch's $650,000 note, and that the note was transferred back from the Bank to ESC.

Jackel's and DiMare's testimony is consistent with ESC's Transfer of Lien to the Bank, granting the Bank a security interest in Tesch's $650,000 note "pursuant to the terms of that certain Security Agreement dated August 29, 2011."  The Security Agreement between the Bank and ESC stated that ESC granted the Bank "a continuing security interest in the Collateral" as security for ESC's indebtedness to the Bank.  "Collateral" is defined in the Security Agreement as "[a]ny and

6

all promissory notes executed in favor of Debtor [identified as ESC] and secured by the lien of a deed of trust on real property within the State of Texas, including all documents covering the same."

This evidence, considered in the light most favorable to the judgment, supports the court's implied finding that ESC had standing to conduct the second foreclosure sale and the court's denial of Tesch's wrongful foreclosure counterclaim. Tesch's first issue is overruled.

**Affirmative defense of "illegal contractual penalty" is waived**

Within his second issue, Tesch contends that the district court imposed an "illegal contractual penalty" against him by awarding ESC the deficiency amounts it sought to recover under both notes. Tesch failed to plead that affirmative defense and did not seek a trial amendment. *See* Tex. R. Civ. P. 66 (addressing trial amendments), 94 (listing affirmative defenses that must be pled).[5] "The defense of penalty is not waived by the failure to plead it if it is apparent on the face of the petition and established as a matter of law." *Phillips v. Phillips*, 820 S.W.2d 785, 789-790 (Tex. 1991) (concluding that defense of penalty was not waived because face of plaintiff's pleadings stated that she was "entitled to damages . . . in the amount of ten (10) times all losses suffered" and because such pleading established contractual provision's unenforeceability "under our decisions in *Stewart* and *Campesi* as a matter of law"). But whenever the defense of penalty is not "clearly

---

[5] We note that an affirmative defense may be tried by consent when it is not properly pled but is brought before the trial court by the active assistance of both parties. *Bowles v. Reed*, 913 S.W.2d 652, 659-60 (Tex. App.—Waco 1995, writ denied). Nothing in the record shows that the issue of an "illegal contractual penalty" was brought before the trial court by the active assistance of both parties, and the only pleading in the record raising the affirmative defense of penalty was Tesch's motion for new trial. As the Texas Supreme Court has held, an affirmative defense that is not tried by consent and first raised in a post-verdict motion is not preserved. *MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 135-37 (Tex. 2014).

established" on the face of the pleadings, it must be pleaded. *Id.* at 790; *see Grace Interest, L.L.C. v. Wallis State Bank*, 431 S.W.3d 110, 128 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (appellants failed to plead and thus failed to preserve their argument that any waiver of their right to offset against deficiency created unenforceable penalty). Here, ESC's petition for recovery of the deficiencies stemming from Tesch's defaults on separate notes did not clearly establish an "illegal contractual penalty" on its face and under court precedents as a matter of law. *Cf. id.* Thus, Tesch was required to plead this affirmative defense, and the failure to do so waived this subpart of his second issue.[6]

### Election of remedies not required

Also within his second issue, Tesch contends that ESC received an improper double recovery and the district court should have required ESC to elect its remedy—i.e., to recover either: (1) its $808,203.80 of "Claims" under the Tolling Agreement that were related to Tesch's default on the first note or (2) foreclose on the Tract and seek any deficiency from the second foreclosure under the second note—but not to recover deficiencies on both his notes. Tesch further contends that ESC elected the latter when it chose to foreclose under the second deed of trust.[7]

---

[6] Even if Tesch had not waived this issue, he failed to identify any provision in an agreement between himself and ESC that was "illegal." He argues only that the court's awarding "double deficiencies" to ESC represented an "illegal contractual penalty," a misinterpretation of the Tolling Agreement, and a failure to require ESC to elect its remedies. In the election-of-remedies discussion that follows, we address and reject the arguments that the court's award of deficiencies on both notes was improper, that the Tolling Agreement was misinterpreted to allow such award, and that an election of remedies was required.

[7] However, the second deed of trust specifies that "[p]roceeding under this Deed of Trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies."

8

We conclude that the evidence, viewed in the light most favorable to the judgment, supports the court's implied finding that ESC was not required to "elect" between the deficiencies resulting after Tesch's defaults on his first and second notes. The election of remedies doctrine is designed "to prevent a party who has obtained a specific form of remedy from obtaining a different and inconsistent remedy for the same wrong," and "to prevent a double redress for a single wrong." *Whittington v. City of Austin*, 456 S.W.3d 692, 710 (Tex. App.—Austin 2015, pet. denied) (citing *Fina Supply, Inc. v. Abilene Nat'l Bank*, 726 S.W.2d 537, 541 (Tex. 1987); *Slay v. Burnett Trust*, 187 S.W.2d 377, 393 (Tex. 1945)).

### 1. No issue of "double redress for a single wrong"

In this case, there was not merely a "single wrong" but two defaults and deficiencies based on two notes. The parties' Tolling Agreement explained that ESC would forego its Claims under the first note as "a contingent accord and satisfaction" if Tesch were to fully satisfy his obligations under the second note, the second deed of trust, and the Tolling Agreement. Further, the Tolling Agreement stated that in the event of an uncured "Event of Default" on the second note and the second deed of trust, ESC could—in addition to seeking remedies on the second note—pursue its Claims against Tesch under the first note:

> 3. <u>Conditional Extinguishing of Claims</u>. *Upon the full satisfaction by Tesch of all obligations accruing to Tesch under the Note* (as defined below), including the final satisfaction of all principal, interest and other reimbursable costs *and the full and faithful performance of all other obligations described in the Note, the Deed of Trust and this Agreement*, ESC's Claims shall be waived, released and extinguished by ESC and of no further force or effect, and all of Tesch's corresponding counterclaims related to the Claims shall likewise be waived released, and extinguished by Tesch, it being the intent of the parties hereto that the terms of this Agreement, including the terms of the Note and Deed of Trust, represent a contingent accord and satisfaction

9

of the same upon full satisfaction of the conditions stated therein. *In the event an uncured Event of Default occurs under the Note and Deed of Trust, ESC may, in addition to all remedies available as described therein, pursue its Claims against Tesch*, in which case Tesch may pursue all of its related counterclaims and defenses against ESC.

(Emphases added.) Tesch subsequently defaulted on the second note and second deed of trust to ESC.[8] This record shows that ESC did not obtain a "different and inconsistent remedy for the

_____

[8] Tesch contends that no "Event of Default" occurred under the Tolling Agreement and that a default under the second note was not a default under the second deed of trust ("[T]he 2011 Deed of Trust contained no cross-default language under which a failure to pay or other default under the 2011 Note would be considered an 'Event of Default' under the 2011 Deed of Trust."). However, the second deed of trust includes as an "Event of Default" a failure to comply with the terms of payment—i.e., the installments as provided in the $650,000 second note:

**Terms of Payment:** In installments as provided in said Note [identified as the $650,000 promissory note]

. . . .

If Grantor [Tesch] performs all the covenants and *pays the Note according to its terms*, this Deed of Trust shall have no further effect, and Beneficiary [ESC] shall release it at Grantor's expense.

. . . .

Upon the occurrence of an *Event of Default* (as that term is defined below), *including the covenants to pay when due all sums* secured by this Instrument, Beneficiary shall have the remedies of a secured party under the Texas UCC and, at Beneficiary's option, may also invoke the remedies provided in this Instrument as to such property or items.

. . . .

Grantor hereby represents and warrants to Beneficiary: . . . That the Grantor's *failure to comply with any of the terms hereof* shall be considered an "Event of Default" as described herein.

10

same wrong"; rather, there were two separate loan transactions between Tesch and ESC, resulting in two separate defaults, two separate foreclosure sales, and two separate deficiencies. *See, e.g.*, *Knights of Columbus Credit Union v. Stock*, 814 S.W.2d 427, 431-32 (Tex. App.—Dallas 1991, writ denied) (noting "[c]ross-collateralization does not magically transform three separate loans into one loan").

### 2. *No issue of inconsistent remedy*

Further, there is no issue of an "inconsistent remedy" because ESC did not retain the Tract and sue for the two notes' entire balances; ESC sued for the notes' *deficiencies*. Deficiency-judgment suits are permitted under the Property Code when the price the real property brings at a non-judicial foreclosure sale is less than the unpaid balance of the debt secured by the real property. Tex. Prop. Code § 51.003(a) ("If the price at which real property is sold at a foreclosure sale under Section 51.002 is less than the unpaid balance of the indebtedness secured by the real property, resulting in a deficiency, any action brought to recover the deficiency must be brought within two years of the foreclosure sale and is governed by this section."). Foreclosing lenders may recover such deficiency judgments against borrowers or guarantors after the lenders themselves have purchased the real property at its foreclosure sale. *See, e.g.*, *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 3 (Tex. 2014) (I-35 foreclosed on property at issue, purchased it at foreclosure sale, and then sued Moayedi for deficiency balance); *Myers v. Southwest Bank*, No. 02-14-00122-CV, 2014 Tex. App. LEXIS 13288, at *2 (Tex. App.—Fort Worth Dec. 11, 2014,

(Emphases added.) It is undisputed that Tesch failed to make all payments when due under the second note. That uncured default was an "Event of Default" under the terms of the second note, the second deed of trust, and the Tolling Agreement.

11

pet. denied) (mem. op.) (bank foreclosed on property, purchased it at foreclosure, and sued guarantor for deficiency); *Grace Interest*, 431 S.W.3d at 118-19 (bank foreclosed on property, purchased it at foreclosure, and sued borrower and guarantors for deficiency).

### 3. *No complaint below about amount of deficiency from first foreclosure*

Although there were two post-foreclosure deficiency judgments here, Tesch's live pleadings, as previously noted, complained only about the second foreclosure (defined specifically in his pleadings as the "foreclosure sale [ESC] conducted on or about January 3, 2012"). Tesch made no complaint below about the amount of the deficiency after the first foreclosure, nor did he seek any fair-market-value determination for the Tract as of the date of the first foreclosure. *See* Tex. Prop. Code § 51.003(b) ("Any person against whom such a [deficiency] recovery is sought by motion may request that the court in which the action is pending determine the fair market value of the real property as of the date of the foreclosure sale."). When as here, there is no fair-market-value determination, the price from the foreclosure sale is used to compute the deficiency. *Id*. § 51.003(c) ("If no party requests the determination of fair market value or if such a request is made and no competent evidence of fair market value is introduced, the sale price at the foreclosure sale shall be used to compute the deficiency."). Tesch waived any complaint about the deficiency amount from the foreclosure sale of the first note. Thus, ESC was not required to "elect" between the two post-foreclosure deficiencies that followed after Tesch's defaults on the first and second notes.

We overrule this subpart of Tesch's second issue.

**Sufficient evidence supported ESC's deficiency judgment**

In his third issue, Tesch contends that the district court's award of a deficiency judgment to ESC in connection with the second foreclosure was based on legally insufficient evidence as to the fair market value of the Tract.

In conducting a legal sufficiency review, we credit favorable evidence if a reasonable factfinder could do so, disregarding contrary evidence unless a reasonable factfinder could not, and consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). The factfinder is the only judge of the witnesses' credibility and the weight to give to their testimony. *See id.* at 819. We sustain a legal insufficiency challenge only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810.

We begin by noting that an offset to a deficiency-judgment claim under section 51.003 of the Property Code is an affirmative defense. *PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 557 (Tex. 2015). Borrowers are entitled to an offset only if they request, prove, and obtain a finding of the property's section 51.003 fair market value as of the date of the foreclosure sale and that value exceeds the foreclosure sales price. *Id.*; *see also* Tex. Prop. Code § 51.003(b) (allowing any person against whom deficiency recovery is sought to file motion requesting trial court to determine fair market value of real property as of date of foreclosure sale), (c) (providing for offset against deficiency if court determines that fair market value is greater than

13

sale price of property at foreclosure). Accordingly, Tesch bore the burden of proving and obtaining a finding of the fair market value for the Tract, as of the January 3, 2012 foreclosure date, that exceeded the second foreclosure sales price of $400,000.

Tesch contends that no evidence supports the district court's implied finding of $400,000 as the Tract's section 51.003 fair market value as of January 3, 2012, and the only "properly admissible" evidence was his expert's testimony establishing the fair market value on that date was $1,165,000—an amount in excess of his debt. Because the district court granted ESC a deficiency judgment on the second foreclosure, the court impliedly rejected Tesch's $1,165,000 valuation of the Tract. Given that the court impliedly found against Tesch and that he had the burden of proof, to prevail he must show both that no evidence supported the district court's implied finding, and if there was none, that the evidence conclusively established the Tract's value was the $1,165,000 amount that he alleges. *See Martin*, 459 S.W.3d at 557.

"Fair market value," as used in section 51.003(b) of the Property Code, does not equate precisely to the historical definition of "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *Id*.; *see City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001) (stating historical definition of fair market value). Rather, the definition of fair market value includes evidence of the enumerated factors that section 51.003(b) authorizes the trial court to consider in its discretion, to the extent that such evidence is not subsumed in the historical definition. *Martin*, 459 S.W.3d at 557 (holding that under section 51.003(b)(5) of Property Code trial court could consider evidence of "the necessity and amount of any discount to be applied

14

to the future sales price" of property, even though that evidence was not within the historical "willing buyer-willing seller" construct).

In determining fair market value, a factfinder is allowed to set the value of the property at any amount between the lowest and highest values supported by the evidence. *Preston Reserve, L.L.C. v. Compass Bank*, 373 S.W.3d 652, 666 (Tex. App.—Houston [14th Dist.] 2012, no pet.), *abrogated in part on other grounds by Martin*, 459 S.W.3d at 553 n.1. Property valuation may be based on a variety of relevant factors, including evidence of tax valuations. *Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 159 (Tex. 2012). The Tax Code provides that the appraisal district list property and its appraised value reflecting the market value as of January 1 of the tax year. Tex. Tax Code § 23.01; *Atascosa Cty. Appraisal Dist. v. Tymrak*, 858 S.W.2d 335, 336 (Tex. 1993).

Here, the district court's implied finding of the Tract's $400,000 fair market value is supported by evidence of the Williamson County Appraisal District's determination that the Tract had a 2012 market value ranging from $453,168 with improvements to $374,261 without improvements.[9] According to the Appraisal District's data, the 2012 amount reflected a downturn from the Tract's $477,877 market value in 2011. Evidence before the court also established that one of the Tract's weaknesses was its "primarily rural" nature, and an agricultural exemption on the Tract decreased its market value. A $400,000 valuation of the Tract is within the $374,261–$453,168 range of evidence provided at trial.

---

[9] The Appraisal District attributed $78,907 of the Tract's 2012 market value to its improvements.

Further, Tesch did not conclusively prove that the Tract's value was $1,165,000. Although Tesch's expert produced a report indicating that value, the evidence supports the district court's implied rejection of it. "If an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded." *City of Keller*, 168 S.W.3d at 813. Here, Tesch's expert's valuation was based on his assumption that the sales prices of four *commercial* properties were comparable to the Tract that was primarily rural in nature, had an agricultural exemption, and was used to run cattle and lambs.[10] The $1,165,000 price was also based on Tesch's expert's assumption that there were "no special or creative financing or sales concessions granted by anyone associated with the sale." The expert acknowledged that a 100% seller-financed conveyance, as occurred here between ESC and Tesch, was something he would have to consider as an appraiser and potentially downgrade the sales price.

Alternatively, if the district court determined that neither party provided competent evidence of the Tract's fair market value, the Property Code required use of the Tract's $400,000 sale price at the second foreclosure to compute the deficiency. *See* Tex. Prop. Code § 51.003(c) ("If no party requests the determination of fair market value or if such a request is made and no competent evidence of fair market value is introduced, the sale price at the foreclosure sale shall be used to compute the deficiency.").

We conclude that the evidence at trial, considered in the light most favorable to the judgment, supports the award of a deficiency judgment to ESC in connection with the second foreclosure. The $400,000 price at which the Tract sold at the second foreclosure sale was less than

---

[10] ESC's expert testified at trial that none of these four properties were accurate comparables to the subject property (the Tract).

16

the $671,412.50 unpaid balance of Tesch's indebtedness. *See* Tex. Prop. Code § 51.003(a). The resulting deficiency after the second foreclosure was $271,412.50 plus $57,689.35 of accrued interest as of the date of trial, totaling $329,101.85. Because Tesch did not meet his burden of proving and obtaining a finding that the fair market value of the Tract, as of the second foreclosure date, exceeded its foreclosure sales price of $400,000, he was not entitled to an offset against that deficiency. *See id.* § 51.003(b), (c). Tesch's third issue is overruled.

## CONCLUSION

Having overruled Tesch's appellate issues, we affirm the district court's judgment.

Jeff Rose, Chief Justice

Before Chief Justice Rose and Justice Pemberton;
    Former Chief Justice Jones not participating

Affirmed

Filed: December 11, 2015

17