

# NUMBER 13-17-00277-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

PINEDA REO, LLC,                                                    Appellant,

## v.

THE LOMIX LIMITED PARTNERSHIP, ET AL.,                    Appellees.

### On appeal from the 138th District Court
### of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Rodriguez and Benavides[1]**
**Memorandum Opinion by Justice Benavides**

Appellant Pineda REO, LLC appeals from a take-nothing judgment from its suit to

collect on commercial loan guaranties. [2]    Appellees, collectively referred to as

---

[1]  The Honorable Nelda V. Rodriguez, former Justice of this Court, was a member of the panel when this case was orally argued but did not participate in this decision because her term of office expired on December 31, 2018.

[2]  Pineda REO, LLC is the current note holder, although the note was originally purchased by

Guarantors,[3] also cross-appeal[4] challenging the trial court's grant of partial summary judgment in Pineda's favor before trial. In addition, Guarantors also raise two conditional cross points challenging Pineda's attorneys' fees and the manner in which the cap on the guaranties should be applied.

By issues one and two, Pineda contends it should prevail as a matter of law on Guarantors' defense of wrongful foreclosure and its claim for offset by the anti-deficiency statute because Guarantors waived their rights in the 2007 Guaranties. By issues three, four, and seven, Pineda challenges the sufficiency of the evidence on Guarantors' defense of wrongful foreclosure. By issue five, Pineda asserts that as a matter of law the 2007 Guaranties did not release Drs. Guajardo and Wong from their previous guaranties. By issue six, Pineda challenges the trial court's failure to issue a deficiency judgment based upon the jury verdict.

We reverse and render in part, reverse and remand in part, and affirm in part.

## II. BACKGROUND[5]

### A. Factual Background

In 2004, a group of Brownsville physicians and others formed Brownsville MD Ventures, L.L.C. (MD Ventures) to purchase the Brownsville Surgical Hospital (BSH).

---

Pineda Grantors Trust in 2012. We refer to them jointly as Pineda.

[3] Appellees consist of The Lomix Limited Partnership, The Guajardo Family Limited Partnership, C. Lynn Anderson, Chester Gonzalez, Manuel G. Guajardo, Jose Humberto Jimenez, Robert Lekach, Miguel Molinas, Bradley Nordyke, Madhaven Pisharodi, Vicki Miles Rodriguez, Gerardo Jesus Sanchez, She Ling Wong, and Charles Zavala.

[4] Appellees Jimenez and Sanchez did not file a notice of cross-appeal.

[5] The background facts are taken from the summary judgment submissions and the evidence at trial.

The purchase was supported by an $8,000,000 loan from Texas State Bank (TSB) and guaranteed by the investors.[6]

In September 2006, MD Ventures borrowed another $6,000,000 from TSB which was also guaranteed by the investors. The 2004 and 2006 guaranties were nearly identical.

In November 2007, TSB loaned MD Ventures additional money and consolidated the 2004 and 2006 notes for a total loan amount of $16,852,317. New guaranty documents were signed in 2007, and the 2007 Note stated:

> The note hereby secured is a master note and represents funds to be advanced to grantor pursuant to request for draws and to be used for the renewal and extension of two existing loans in favor of Texas State Bank . . . with the remaining balance to be used for the expansion of the existing facility located on the above-described property . . . .

The Loan Agreement listed the Guarantors as: Gerardo Jesus Sanchez, Asim Zamir, The Guajardo Family Limited Partnership, C. Lynn Anderson, Jose Humberto Jimenez, Charles Zavala, Bradley Nordyke, The Lomix Limited Partnership, Robert Lekach, Michael S. Gomez, Madhaven Pisharodi, Vicki Miles Rodriguez, Chester Gonzalez, and Miguel A. Molinas. Each of the listed Guarantors executed new guaranty documents. Several of the Guarantors testified that TSB's attorney drew up all of the loan and guaranty documents in 2004, 2006, and 2007.

In 2009, TSB merged with Compass Bank (Compass). Compass, an Alabama corporation, also acquired several other Texas banks at the same time. Compass was owned by BBVA, a Spanish bank.

---

[6] Over time, the investor group varied but most of the present Guarantors were original investors.

In 2010, BSH discovered that it had water infiltration and mold resulting from construction defects during renovations. The mold eventually caused BSH to seal off the second floor which included operating and patient rooms. In 2011, the entity that operated BSH stopped paying rent. By the end of 2012, the entity operating BSH owed MD Ventures $3,000,000 in past-due rent.

By 2012, MD Ventures decided to either renegotiate the loan or sell BSH. MD Ventures approached Compass and negotiated interest only payments on the note.

In 2012, Compass decided to liquidate some of its commercial loan portfolio. It privately auctioned several portfolios of commercial loans, including MD Ventures' 2007 Note, to large corporate bidders who participated by invitation. Compass kept the sale of the commercial loan portfolios confidential. The information available to the bidders included the Guarantors' confidential financial information. The Guarantors knew nothing about the planned sale of their loan. In June 2012, Compass commissioned an appraisal of BSH. The appraisal estimated BSH's fair market value at $21.9 million. Investor bidding on Compass' loan portfolio including MD Ventures' note began September 4, 2012.

In September 2012, MD Ventures advised Compass of a $15 million offer to buy BSH by Alamo Street Development, but Compass did not respond. MD Ventures furnished Compass with the proposed real estate contract on October 2, 2012 with a projected closing date of November 15, 2012. If Compass approved the contract, it would receive $12,000,000, which was less than the amount due on the note. Compass never responded regarding this prospective sale. MD Ventures did not know that

4

Compass was trying to sell the note at this time.

On October 19, 2012, MD Ventures gave Compass permission for prospective purchasers of the note to review confidential financial information related to BSH and the Guarantors. The bank sold one loan portfolio, including MD Ventures' note, to Istrouma Trustee, LLC as trustee for Pineda Grantor Trust, II[7] on November 1, 2012. The amount Pineda paid for the 2007 Note was excluded from evidence at trial. However, Guarantors learned in discovery in other litigation that Pineda's accepted bid for the 2007 Note was approximately 54% of its value to Compass, as part of Pineda's overall bid for the entire loan portfolio.

On January 7, 2013, Pineda's attorney sent the first of a series of letters to MD Ventures and the Guarantors advising them that the note was in default and that Pineda would seek to exercise all of its rights under the note and the guaranties. In August 2013, Pineda accelerated the note and demanded payment in full by September 3, 2013.

On August 26, 2013, MD Ventures filed a voluntary petition in bankruptcy and obtained a stay of actions related to BSH. Pineda then initiated this action against the Guarantors to collect the alleged deficiency.

On June 16, 2014, the bankruptcy court lifted the automatic stay to allow foreclosure. Pineda posted BSH for foreclosure in August 2014 and sent the Guarantors a letter dated August 12, 2014 with a Notice of Substitute Trustee's Sale scheduled for September 2, 2014. By that time BSH was vacant. The Guarantors sought a temporary

---

[7] Pineda Grantor Trust II purchased the note. Before foreclosure, the note was transferred to Pineda REO. Neither Pineda entity has employees. The purchase and servicing of the Note was handled by Capital Crossing Servicing Company (Capital Crossing) on behalf of Pineda.

restraining order and temporary injunction in this action to prevent foreclosure on the grounds that they had a prospective buyer for BSH for $18 million. The trial court denied the motion on August 19, 2014. BSH was scheduled to be sold at foreclosure on September 2, 2014 at 1:00 p.m.

Before the September 2, 2014 sale, Dennis Stratford, the senior vice president in charge of asset management for Capital Crossing, received several calls regarding the BSH sale. The inquiries were from two different entities who were interested in BSH, one of which was Optima. Optima was trying to prevent the foreclosure sale and purchase BSH through the bankruptcy proceedings. Another prospective buyer asked what Pineda's position was going to be at the auction. According to Stratford, he refused to discuss Pineda's bidding position and invited the prospective buyer to attend the foreclosure auction.

On the morning of September 2, 2014, MD Ventures attempted to postpone the foreclosure sale in the bankruptcy court. MD Ventures had reached a tentative agreement with Optima for an immediate payment of $400,000 to Pineda. The bankruptcy court refused to stay the sale but told Pineda that if $400,000 was delivered to it by 1:00 p.m., they could not foreclose: "if you've got $400,000 I'm going to stop the sale. You get $400,000 before 1:00 o'clock . . . the sale is off." The bankruptcy court did not sign an order but the clerk made the following entry on the bankruptcy court's electronic docket sheet: "Arguments heard. Motion approved. Debtor was ordered to include specific aspects in the plan. The sale was cancelled. Parties are to process payment later today. A detailed order will follow."

6

The foreclosure auction was held shortly after 1:00 p.m. on September 2, 2014 on the Cameron County Courthouse steps. According to Jeffrey Livingston, the attorney hired by Pineda to bid on the hospital at the foreclosure sale, he made a $7 million credit bid for BSH. No one else bid. The Substitute Trustee's Deed memorializing the sale was filed with Cameron County later that day, but the amount paid for BSH was left blank.

On September 3, 2014, MD Ventures filed a motion to dismiss the bankruptcy proceedings. MD Ventures filed a petition in intervention in this case in November 2014 in which it claimed wrongful foreclosure against Pineda. Pineda opposed the intervention.

B.    Procedural Background

Pineda filed its first no-evidence motion for summary judgment in November 2014 as to the Guarantors' defenses of: usury, failure to mitigate damages, fraud, unclean hands, material alteration of the note, offset/setoff, limitations, and negligence. Pineda also sought a ruling dismissing other defenses as not recognized by Texas law.

Pineda filed a traditional motion for partial summary judgment seeking recovery of a deficiency judgment against the Guarantors and daily interest. Alternatively, Pineda sought summary judgment declaring that it: owned the Guaranties; MD Ventures was in default by August 14, 2014; the Guarantors defaulted; they breached their guaranties; and Pineda was damaged. Pineda next filed traditional and no-evidence motions for summary judgment on the Guarantors' counterclaims[8] in December 2014.

---

[8] Guarantors' counterclaims included: breach of duty to act reasonably and in good faith, breach of contract, unjust enrichment and illegal contract, and usury.

After a full day hearing on February 11, 2015, the trial court issued an order on February 19, 2015:

1. striking MD Venture's plea in intervention;

2. granting Pineda's motion for protective order and precluding discovery on the value of BSH and Pineda's purchase of BSH note and guaranties; and

3. granting Pineda's motion for summary judgment in part and dismissing with prejudice Guarantors' alleged counterclaims for:

    a. civil conspiracy to breach the common law duty of good faith and fair dealing,

    b. breach of the duty of good faith and fair dealing, and

    c. bad faith and unreasonable foreclosure.

The Guarantors filed responses to Pineda's additional motions and sought reconsideration of the protective order. The trial court denied the motion to reconsider.

Additionally, Drs. Guajardo and Wong filed motions for summary judgment asserting that they were not liable on the 2007 Note because they did not sign personal guaranties. The Guarantors also sought a continuance of the hearing on the motions for summary judgment to obtain and compel discovery against Pineda.

On October 7, 2015, the trial court conducted another lengthy hearing and took the matters under advisement. On October 30, 2015, without ruling on Guarantors' pending discovery motions, the trial court advised the parties that Pineda's various motions for summary judgment to dismiss Guarantors' remaining counter-claims and defenses, and Pineda's motion for a deficiency judgment would be granted. The Guarantors objected. The trial court held another hearing and signed a final judgment dated February 16, 2016,

8

disposing of all claims in Pineda's favor. The trial court awarded Pineda a deficiency judgment against each of the Guarantors, including Drs. Guajardo and Wong, up to the limits of liability set forth in the individual guaranties. Guarantors filed motions to reconsider the grants of summary judgment against them and Drs. Guajardo and Wong filed a motion for new trial.

On March 18, 2016, the Guarantors filed a motion to recuse the trial judge. After the motion was filed, the trial judge voluntarily recused himself and a visiting judge was appointed.

On April 20, 2016, the newly-appointed visiting judge heard the motions for new trial and to reconsider the summary judgments granted on February 2016. The newly-appointed judge determined there was a fact issue regarding release of the 2006 guaranties and granted Drs. Guajardo and Wong's motion for new trial. The trial court later determined there was a fact issue as to the Guarantors' defense of wrongful foreclosure and granted their motion for reconsideration only on that issue. Those two issues proceeded to jury trial.

The jury found that Pineda wrongfully foreclosed, that the market value of BSH at the time of foreclosure was $14 million, and that Drs. Guajardo and Wong were not individually liable on the 2007 Note. It assessed $225,000 for Pineda's past attorneys' fees and assessed conditional attorneys' fees for appeal against the Guarantors.

During a hearing on post-judgment motions, Guarantors' counsel argued that the finding of wrongful foreclosure precluded a deficiency judgment for Pineda. The trial court agreed and signed a judgment on May 17, 2017, that Pineda take nothing against

9

the Guarantors, and dismissed Guarantors' counterclaim for wrongful foreclosure.   This appeal followed.

## II.   WRONGFUL FORECLOSURE

By issues three and four, and part of issue seven, Pineda argues that Guarantors' evidence of wrongful foreclosure is legally and factually insufficient.

## A.    Standard of Review

In reviewing a legal sufficiency challenge, we consider the evidence "in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not."   *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).   "Our traditional legal sufficiency—or 'no evidence'—standard of review upholds a finding supported by '[a]nything more than a scintilla of evidence.'"   *State Office of Risk Mgmt. v. Pena*, 548 S.W.3d 84, 90 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.).   "More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach different conclusions."   *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014).   Because it is the jury's province to resolve conflicting evidence, we must assume that jurors resolved all conflicts in accordance with their verdict if reasonable jurors could do so.   *City of Keller*, 168 S.W.3d at 819.

In a factual sufficiency review, we consider and weigh all the evidence supporting and contradicting the finding in question.   *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pope v. Moore*, 722 S.W.2d 683, 624 (Tex. 1986).   We will set aside a finding only if the evidence supporting it is so weak or it is so against the

10

overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

## B. Applicable Law

In this case, the Guarantors pleaded wrongful foreclosure as an affirmative defense to Pineda's request for a deficiency judgment. *See UMLIC VP LLC v. T & M Sales & Envt'l Sys., Inc.*, 176 S.W.3d 595, 611 (Tex. App.—Corpus Christi–Edinburg 2005, pet. denied) ("Wrongful foreclosure is an appropriate affirmative defense to a suit to collect on a note."). The purpose of a wrongful foreclosure action is to protect mortgagors against mistake, fraud, or unfairness in the conduct of a foreclosure sale. *Hurd v. BAC Home Loans Servicing, LP*, 880 F.Supp. 2d 747, 766 (N.D. Tex. 2012) (applying Texas law); *In re Keener*, 268 B.R. 912, 921 (N.D. Tex. 2001). The trial court submitted this case to the jury based upon the elements of wrongful foreclosure set out in *Estate of Broughton v. Financial Freedom Senior Funding Corp.*: (1) a defect in the foreclosure sale proceedings; (2) an inadequate selling price; and (3) a causal connection between the defect and the inadequate selling price. No. 13-14-00091-CV, 2016 WL 2955058, at *2 (Tex. App.—Corpus Christi–Edinburg May 19, 2016, pet. granted, judgm't vacated w.r.m.) (mem. op.); *see also Sauceda v. GMAC Mortg. Corp.*, 268 S.W.3d 135, 139 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) (reciting the elements of wrongful foreclosure); *Charter Nat'l Bank–Hous. v. Stevens*, 781 S.W.2d 368, 375 (Tex. App.—Houston [14th Dist.] 1989, writ denied).[9]

---

[9] "It never was intended that there should be an automatic need to prove a grossly inadequate selling price in a situation where the bidding at a non-judicial foreclosure sale was deliberately 'chilled' by

"[T]he rule is well established that mere inadequacy of consideration is not grounds for setting aside a trustee's sale if the sale was legally and fairly made." *Am. Sav. & Loan Ass'n of Hous. v. Musik*, 531 S.W.2d 581, 587 (Tex. 1975). "There must be evidence of irregularity, though slight, which irregularity must have caused or contributed to cause the property to be sold for a grossly inadequate price." *Id.*; *see also Charter Nat'l Bank–Hous.*, 781 S.W.2d at 371.

## C.     Defects in the Foreclosure Proceedings

The first element in a wrongful foreclosure action is proof of a defect in the foreclosure proceedings. Guarantors argue that there were multiple irregularities or defects in the foreclosure sale including an inadequate sales price. The first alleged irregularity is the blank in the Trustee's deed. Guarantors also criticize the notice of sale because it failed to state the name and address of the mortgagee and the mortgage servicer in violation of §§ 51.002(b) and 51.0025 of the property code. *See* TEX. PROP. CODE ANN. §§ 51.002(b), 51.0025.[10]   Next, the Guarantors argue that the bankruptcy

---

the affirmative acts of a mortgagee and the injured mortgagor seeks a recovery of damages rather than a setting aside of the sale itself." *Charter Nat'l Bank–Hous. v. Stevens*, 781 S.W.2d 368, 375 (Tex. App.—Houston [14th Dist.] 1989, writ denied).

[10]   Section 51.0025 provides:

A mortgage servicer *may administer the foreclosure of property* under Section 51.002 on behalf of a mortgagee if:

(1) the mortgage servicer and the mortgagee have entered into an agreement granting the current mortgage servicer authority to service the mortgage; and

(2) the notices required under Section 51.002(b) disclose that the mortgage servicer is representing the mortgagee under a servicing agreement with the mortgagee and the name of the mortgagee and:

(A) *the address of the mortgagee*; or

(B) *the address of the mortgage servicer*, if there is an agreement granting

12

court stayed the sale and the sale was conducted in violation of that court's order. Guarantors finally argue that the bankruptcy court's docket entry chilled prospective buyers.

### 1. Blank in Trustee's Deed

Pineda argues that the blank where the sales price should be in the Trustee's Deed is not a defect in the foreclosure because the deed was filed after the sale and thus could have had no effect on the adequacy of the price paid. Pineda further argues that Chapter 51 does not require that the price be stated in the deed. *See Peterson v. Black*, 980 S.W.2d 818, 822 (Tex. App.—San Antonio 1998, no pet.) (holding that failure to record trustee's deed did not invalidate foreclosure).

Guarantors argue that the blank supports a finding that the sale occurred only on paper and did not qualify as a foreclosure sale pursuant to § 51.002. *See* TEX. PROP. CODE ANN. § 51.002; *Estate of Broughton*, 2016 WL 2955058, at *3 n.7. Guarantors alternatively argue that the blank cast doubt on the amount allegedly bid at the sale and that other evidence of the bid amount is suspect. However, Livingston testified he bid $7 million on behalf of Pineda. Livingston further testified that he attended the sale, and although there were others standing around at the time of the sale, no one else bid on BSH. In addition, Kevin Shea, who was acting for Capital Crossings, Pineda's servicing company, testified he was on the telephone with Livingston at the time of the foreclosure sale although he did not recall the details when he testified at trial.

---

a mortgage servicer the authority to service the mortgage.

TEX. PROP. CODE ANN. § 51.0025 (emphasis added).

Livingston did not know why the substitute trustee's deed did not include the bid amount or why his and the substitute trustee's affidavits were not completed in September 2014. He was not aware of the proceedings in bankruptcy court earlier that morning and did not see the docket entry.

We agree with Pineda that because the deed was filed after the sale, it could not have had an impact on the conduct of any other prospective bidders. *See Peterson*, 980 S.W.2d at 822 (holding that trustee's failure to record deed did not affect the bidding at the foreclosure sale); *see also Powell v. Stacy*, 117 S.W.3d 70, 74 (Tex. App.—Fort Worth 2003, no pet.) (holding that trustee's duty is to conduct the sale fairly in accord with the deed and the property code requirements).

**2. Defective Notice of Sale**

Although the Guarantors waived notice of sale, Chapter 51 of the property code requires specific information in the notice of sale posted and filed at the courthouse. *See* TEX. PROP. CODE ANN. § 51.002. "The statutory notice provisions of section 51.002 seek to [] protect the debtor by affording him a lengthy notice period in which he may cure, but also adequately inform the . . . public . . . to maximize the likelihood of a profitable public sale at market value . . . ." *Jasper Fed. Sav. & Loan Ass'n v. Reddell*, 730 S.W.2d 672, 674–75 (Tex. 1987); *see also Senger Creek Dev., LLC v. Fuqua*, No. 01-15-1098-CV, 2017 WL 2376529, *9 (Tex. App.—Houston [1st Dist.] June 1, 2017, no pet.) (mem. op.).

Guarantors criticize the Notice of Substitute Trustee's Sale because it does not include an address for the note-holder Pineda, nor does it identify the mortgage servicer, Capital Crossings. Section 51.0025 provides that a mortgage servicer "may administer

14

the foreclosure of property" under specified conditions, which include providing "the address of the mortgagee," or "the address of the mortgage servicer" in the notice of foreclosure. *See* TEX. PROP. CODE ANN. § 51.0025. Although Capital Crossings serviced Pineda's mortgage, Capital Crossings did not conduct the foreclosure. The foreclosure was conducted by a substitute trustee. Thus, we agree with Pineda that § 51.0025 does not apply because the sale was not conducted by a mortgage servicer. *Id.* Instead, the notice included the address for the substitute trustee as required by § 51.0075(e). *See id.* § 51.0075(e).[11]

### 3. Bankruptcy Court

Guarantors next argue that the bankruptcy court stayed the sale and alternatively that its docket entry chilled prospective buyers. The evidence contradicts Guarantors' argument; the bankruptcy stay was lifted three months before the foreclosure sale and the bankruptcy court transcript reflects that the bankruptcy court did not stay the sale at

---

[11] Section 51.0075 states in pertinent part as follows:

(a) A trustee or substitute trustee may set reasonable conditions for conducting the public sale if the conditions are announced before bidding is opened for the first sale of the day held by the trustee or substitute trustee. . . .

(c) Notwithstanding any agreement to the contrary, a mortgagee may appoint or may authorize a mortgage servicer to appoint a substitute trustee or substitute trustees to succeed to all title, powers, and duties of the original trustee. A mortgagee or mortgage servicer may make an appointment or authorization under this subsection by power of attorney, corporate resolution, or other written instrument.

(d) A mortgage servicer may authorize an attorney to appoint a substitute trustee or substitute trustees on behalf of a mortgagee under Subsection (c).

(e) *The name and a street address for a trustee or substitute trustees shall be disclosed on the notice required by Section 51.002(b).*

*Id.* § 51.0075.

15

the hearing. The bankruptcy court judge stated at the hearing that the sale would be cancelled *only if* Pineda received $400,000 before 1 p.m., when the foreclosure sale was scheduled. Shea and Gonzalez testified that Pineda did not receive the funds.

Guarantors further argue that dissemination of the bankruptcy court's docket sheet entry chilled the sale. The docket entry states in pertinent part, "Arguments heard. Motion approved. . . . *The sale was cancelled.* Parties are to process payment later today. A detailed order will follow." (emphasis added). Shea testified that the docket entry was issued at 9:59 a.m. on September 2, 2014. Livingston testified that there were others present, but no one else bid at the foreclosure sale. Guarantors contend, based upon the following argument of Pineda's bankruptcy counsel, that other bidders were expected at the sale:

> There is interest—I mean, there is evidently, there are going to be people at the auction today, I mean, so there is a very—and I don't know what those—nobody has told me what they have in mind . . . but I've had a call from someone in the Valley and I know that [Pineda's counsel] has had a call, so there are potential bidders for this property, and a lot could be done through this auction process.

Texas law recognizes that a mortgagee is under a duty to avoid affirmatively deterring third party bidding by acts or statements made before or during the foreclosure sale. *Powell v. Stacy*, 117 S.W.3d 70, 74 (Tex. App.—Fort Worth 2003, no pet.); *accord Peterson*, 980 S.W.2d at 822 (stating a trustee "must conduct a foreclosure sale fairly and not discourage bidding by acts or statements made before or during the sale"); *Sanders v. Shelton*, 970 S.W.2d 721, 724 (Tex. App.—Austin 1998, pet. denied) (providing that a mortgagee "is under a duty to avoid affirmatively deterring third party bids . . . but is under no duty to take affirmative action, beyond that required by statute or deed of trust, to

16

secure a fair sale"); *Gainesville Oil & Gas v. Farm Credit Bank of Tex.*, 847 S.W.2d 655, 659–60 (Tex. App.—Texarkana 1993, no writ) (holding that actions of the foreclosing bank discouraged bidding at foreclosure sale); *see also Pentad Joint Venture v. First Nat'l Bank of LaGrange*, 797 S.W.2d 92, 96 (Tex. App.—Austin 1990, writ denied) ("Texas law recognizes that a mortgagee is under a duty to avoid affirmatively deterring third party bidding by acts or statements made before or during the foreclosure sale.").

Texas courts also recognize that not all defects in the foreclosure process create a chilling effect on prospective buyers. *See Musik*, 531 S.W.2d at 587–88 (holding that procedure of appointing substitute trustee and alleged alteration of deed of trust did not constitute irregularity in foreclosure), *First State Bank v. Keilman*, 851 S.W.2d 914, 923 (Tex. App.—Austin 1993, writ denied) (collecting cases); *see also Resolution Tr. Corp. v. Summers & Miller Gleneagles Joint Venture*, 791 F.Supp. 653, 655 (N.D. Tex. 1992) (finding that incorrect property description in notice of foreclosure sale did not chill the sale).

The defects that ordinarily impair a foreclosure are those in which notice is not given as required by statute or the deed, or when the party controlling the process chills the bidding. *See Gainesville Oil & Gas*, 847 S.W.2d at 664 (reversing foreclosure after holding that mortgage-holder's representations chilled bidding at foreclosure sale); *Pentad Joint Venture*, 797 S.W.2d at 96 ("A mortgagee's duty is to avoid affirmatively deterring prospective bidders by acts or statements made before or during a foreclosure sale."). The docket entries Guarantors rely on are the act of the bankruptcy court clerk and are not attributable to any party.

17

However, even if Texas law recognizes that the chilling effect of actions by a stranger to the foreclosure could cause a wrongful foreclosure, the party claiming wrongful foreclosure must still establish a causal effect between that chilling conduct and inadequate price. *See Saucedo*, 268 S.W.3d at 139 (reciting elements); *Gainesville Oil & Gas*, 847 S.W.2d at 664 (holding that evidence of bank's misrepresentations prevented property owner from appearing at foreclosure sale).[12] Guarantors failed to produce any evidence that the docket sheet had any effect on the bidding or on the price of BSH. Accordingly, the evidence was insufficient to support the jury's wrongful foreclosure finding.

## D.    Summary of Wrongful Foreclosure

We sustain Pineda's third and fourth issue and part of its seventh issue. Because we found legally insufficient evidence to support the jury's wrongful foreclosure finding of a defect in the foreclosure proceedings, we need not address: (1) the jury's finding as to the value of BSH on the date of foreclosure; (2) Pineda's fourth issue (regarding the jury instruction on inadequate selling price); or (3) the portion of Pineda's seventh issue challenging the factual sufficiency of the jury's finding of fair market value. *See* TEX. R. APP. P. 47; *Lance v. Robinson*, 543 S.W.3d 723, 740 (Tex. 2018).

---

[12] In *Gainesville Oil & Gas Co., Inc. v. Farm Credit Bank of Texas*, the Texarkana Court reversed a foreclosure after holding:

> [e]vidence tending to prove the Ward couple relied upon representations by the Bank that the oil lease would not be included in the foreclosure sale caused the Ward couple to forego their right to attend the foreclosure sale and protect their interest. Such evidence tends to show conduct by the Bank which diminished competition and stifled a free and open sale and was, therefore, an irregularity in the foreclosure that was damaging to the appellants.

847 S.W.2d 655, 664 (Tex. App.—Texarkana 1993, no writ). There was no similar evidence here.

### III.  WAIVER OF DEFENSES

By its first and second issues, Pineda contends it should prevail as a matter of law on Guarantors' claim of wrongful foreclosure and their claim for relief under the anti-deficiency statute because Guarantors waived their rights in the 2007 Guaranties.  *See* TEX. PROP. CODE ANN. § 51.003.  Because we held in Part II that the evidence in support of Guarantors' claim of wrongful foreclosure is legally insufficient, we do not address Pineda's waiver argument.  *See* TEX. R. APP. P. 47.1.

### IV.  DRS. GUAJARDO AND WONG'S LIABILITY ON 2006 GUARANTY

Throughout this litigation, Drs. Guajardo and Wong have asserted that they were not individually liable for the 2006 guaranties because the 2007 Note extinguished their individual liability.  The jury found that TSB intended to release Drs. Guajardo and Wong from liability on the 2006 Guaranties.  By its fifth issue, Pineda argues that as a matter of law, Drs. Guajardo and Wong's continuing guaranties were not released by the 2007 Loan Agreement or the 2007 Guaranties.  By the remainder of its seventh issue, Pineda argues that the evidence is factually insufficient to support the jury's finding that TSB intended to release Drs. Guajardo and Wong from their 2006 guaranties.

#### A.  Background Facts

In 2004, when the original note and guaranties were signed, the note did not identify the guarantors.  The Lomix was one of the guarantors, and the guaranty was signed by Dr. Wong, as president of the general partner of The Lomix.  The Guajardo Family Partnership was also a guarantor, signed by Dr. Guajardo as president, however both Drs. Guajardo and Wong also signed individual guaranties.  The guaranties for The

19

Lomix and for Dr. Wong, individually, were limited to a maximum of $800,000 each, as were the guaranties for the Guajardo Family Partnership and Dr. Guajardo, individually. The guaranties provided that the guarantors "consent[ed] to all renewals, extensions, modifications, and substitutions of the Debt . . . ." The guaranties further stated: "This Guaranty may not be amended or modified by oral agreement. No amendment or modification of this Guaranty is effective unless made in writing and executed by you [guarantor] and me [Bank]."

The 2006 note states that it is a Master Note and all liens securing the note are second and inferior to the 2004 note. Again, it does not identify the guarantors. The Lomix and the Guajardo Family Partnership continue to be guarantors but with no limit to their liability, although the individual liability of Dr. Guajardo is limited to $2,500,000 and Dr. Wong's individual liability is limited to $1,250,000. The 2006 guaranties and the 2004 guaranties include identical language regarding amendment and modification.

The 2007 Note states that the "Note secured is a Master Note and represents funds to be advanced . . . and to be used for the renewal and extension of two existing loans in favor of [TSB] . . . ." The Note is signed by Dr. Guajardo as President of MD Ventures and by Dr. Wong as president of the general partner of The Lomix. The loan agreement for the 2007 Note identifies the guarantors to include The Lomix and the Guajardo Family Partnership but does not identify Drs. Guajardo or Wong individually. The 2007 loan agreement further states that, "This loan will be guaranteed by limited guaranties from the Guarantors. In this regard, each Guarantor will execute a separate limited Guaranty Agreement for the amounts that will be set forth in said Guaranty

20

Agreement." At trial, Dr. Guajardo testified that his family partnership owned a share of MD Ventures, but he did not.

Dr. Guajardo testified that until 2010, he was the president of the board of directors for MD Ventures and was involved with loan negotiations with TSB in 2004, 2006, and 2007. According to both Dr. Guajardo and Jose Jimenez, TSB's attorney prepared the guaranties in 2007, as he had done in 2004 and 2006. In 2007, TSB's attorney said he wanted the guaranties to track ownership of the shares in MD Ventures. The earlier guaranties added up to 240% of the note, with Dr. Guajardo and his family partnership responsible for up to 41% of the note in 2006, even though the family partnership owned only a single share of MD Ventures. The changes in 2007 were intended to correct the inequities that had found their way into the guaranties. When the guaranties were first executed in 2004, the intent was for each guarantor to guarantee an amount that related to the extent of his or her ownership in MD Ventures. The limitation of liability would then vary such that Dr. Anderson who owned three shares would have greater guarantor liability than those guarantors who owned a single share. Dr. Guajardo and Jimenez testified that the Bank and its attorney intended for the 2007 Guaranties to replace the previous guaranties.

Dr. Wong testified that The Lomix owned one share of MD Ventures. He did not own a share individually. He understood during the process of negotiation of the 2007 Note, that TSB was trying to ensure that only the owners of interests in MD Ventures would be guarantors.

**B.      Standard of Review**

The interpretation of an unambiguous contract is a question of law that we review de novo.   *TRO-X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 462 (Tex. 2018); *EOG Res., Inc. v. Hanson Prod. Co.*, 94 S.W.3d 697, 701 (Tex. App.—San Antonio 2002, no pet.).   Whether a contract is ambiguous is also a question of law for the court.   *TRO-X, L.P.*, 540 S.W.3d at 462.   "If contract language can be given a certain or definite meaning, then it is not ambiguous; it should be interpreted by a court as a matter of law." *Universal Health Servs, Inc.*, 121 S.W.3d at 746*.*   Extrinsic evidence may be used to aid the understanding of an unambiguous contract, but not to create ambiguity.   *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 758 (Tex. 2018).   We may consider extrinsic evidence of the facts and circumstances surrounding the contract's execution as an aid to construction of an unambiguous contract without running afoul of the parol evidence rule. *Id.*

When there are multiple documents pertaining to the same transaction, they may be read together to ascertain the parties' intent, even if they were executed at different times and they do not expressly refer to each other.   *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000).

**C.      Continuing Guaranties**

"A continuing guaranty is one which contemplates a future course of dealing between the lender and debtor and is intended to apply to other liabilities as they accrue." *Sonne v. Fed. Dep. Ins. Corp.*, 881 S.W.2d 789, 793 (Tex. App.—Houston [14th Dist.] 1994, writ denied).   The 2004 and 2006 guaranties are continuing guaranties.   The 2006

22

guaranty is subtitled "(Continuing Debt—Unlimited)."[13]   The documents provide that the guarantors "consent to all renewals, extensions, modifications and substitutions of the Debt" initially incurred by MD Venture.   However, each document also provides that it may be amended or modified only if done in writing and signed by the parties.

The law on guaranties is well-established.   A guarantor may require that the terms of his guaranty be followed strictly, and the guaranty agreement may not be extended beyond its precise terms by construction or implication.   *Reece v. First State Bank*, 566 S.W.2d 296, 297 (Tex. 1978); *McKnight v. Va. Mirror Co.*, 463 S.W.2d 428, 430 (Tex. 1971).

---

[13]  Paragraphs 2 and 3 of the 2006 Guaranty are reproduced below:

2.  I absolutely and unconditionally agree to all terms of and and guaranty to you the payment and performance of each and every Debt, of every type, purpose, and description that the Borrower [MD Ventures] either individually, among all or a portion of themselves, or with others, may now or at any time in the future owe you, including, but not limited to the following described Debt(s) including without limitation, all principal, accrued interest, attorneys' fees and collection costs, when allowed by law, that may become du from the Borrower to you in collecting and enforcing the Debt and all other agreements with respect to the Borrower.

A promissory note or other agreement, No. 31095654, dated September 321, 2000, from Brownsville MD Venture, L.L.C. (borrower) to you in the amount of $6,000,000.

In addition, Debt refers to debts, liabilities, and obligations of the Borrower (including, but limited to, amounts agreed to be paid under the terms of any notes or agreements securing the payment of any debts, loan, liability, or obligation, overdrafts, letters of credit, guaranties, advances for taxes, insurance, repairs, and storage, and all extensions, renewals, refinancings, and modifications of these debts) whether now existing or created or incurred in the future, due or to become due, or absolute or contingent, including obligations and duties arising from the terms of all documents prepared or submitted for the transaction such as applications, security agreements, disclosures, and the Note.

3.  I consent to all renewals, extensions, modifications, and substitutions of the Debt which may be made by you upon such terms and conditions as you may see fit from time to time without further notice to me and without limitation as to the number of renewals, extensions, modifications, or substitutions.

2006 Guaranty.

**D.      Intent of the Parties Regarding 2007 Guaranties**

Pineda argues that the nature of the continuing guaranties makes Drs. Guajardo and Wong liable on the 2006 guaranties because they were not explicitly released in the 2007 Note or loan agreement.

All three documents, the 2007 Note, the 2007 loan agreement, and the 2007 guaranties were prepared by TSB's attorney.   The 2007 loan agreement and note specifically identify the Guarantors as a defined term which was not done in the 2004 and 2006 notes.   The 2007 loan agreement is in writing, signed by both TSB and the identified Guarantors which included the Guajardo Family Partnership and The Lomix but excluded Drs. Guajardo and Wong individually.   Guarantors, as defined in the 2007 loan agreement drafted by TSB, are those guarantors specifically listed.   The note guaranteed by the 2007 guaranty is the "promissory note or other agreement, No. 91088188 dated November 20, 2007, from Brownsville MD Ventures, LLC (Borrower), to you, in the amount of $16,852,317.00."

Pineda relies in part on *Chambers v. NCNB Texas National Bank* and argues that an explicit release is required.   841 S.W.2d 132, 134 (Tex. App.—Houston [14th Dist.] 1992, no writ).   *Chambers* involved a partnership that borrowed money that was guaranteed by the partners.   *See id.*   The partnership later incorporated and obtained another loan.   *Id.*   The guarantor argued that the new loan created a totally new corporate obligation, which removed any further personal obligation on his part.   *Id.*   The trial court disagreed and granted summary judgment to the lender.   The court of appeals affirmed, holding that the partnership note explicitly applied to all renewals and extensions

24

and the guaranty document stated that it applied to changes in the debtor's status by "merger, consolidation, or otherwise." *Id.* at 134. The court's decision was predicated on the plain language of the guaranty, not on any requirement of an explicit release. *Id.*

Pineda also relies on *Travelers Insurance Company v. Bosler* for its claim that executing a new guarantee does not extinguish a previous guarantee. 906 S.W.2d 635, 643 (Tex. App.—Fort Worth 1995, pet. granted, judgm't vacated w.r.m) ("The giving of a new note for a debt evidenced by a former note does not extinguish the old note unless expressed by the parties."). *Bosler* relies in part on *Shepherd v. Eric Schuster Corp.*, 424 S.W.2d 693, 697 (Tex. App.—Houston [14th Dist.] 1968 writ ref'd n.r.e.). The *Shepherd* Court stated the rule as follows: "The fact that an additional guaranty was provided does not prove that the original continuing guaranty was destroyed. It must be shown that the later guaranty was intended and accepted as a substitute for the former." *Id.* "The act of acquiring a new guaranty, in and of itself, does not release or destroy the original guaranty." *Fed. Dep. Ins. Corp. Attayi*, 745 S.W.2d 939, 947 (Tex. App.—Houston [14th Dist.] 1988, no writ). Whether the guarantor is released by the subsequent guaranty depends on whether "the new guaranty is intended and accepted as a substitute for the former." *Shepherd*, 424 S.W.2d at 697; *Warner v. First Nat'l Bank of Waco*, 369 S.W.2d 651, 653 (Tex. App.—San Antonio 1963, no writ) (affirming judgment for the bank because the original guaranty was not revoked in writing as required by its terms).

According to the uncontroverted evidence at trial, the terms of the 2007 Guaranty omitted Drs. Guajardo and Wong individually, not inadvertently, but as a negotiated term.

25

Pineda was also on notice that the 2007 guaranties were intended to replace the 2006 guaranties. Before Pineda bought the 2007 Note, Capital Crossings prepared a Due Diligence Report that listed the Guarantors. In its analysis, the Report notes that MD Ventures is owned by "14 physician/individuals/entities" and there are fourteen guarantors, one of which is a limited partnership owned by Dr. Wong. When describing the guaranties, the report included only the Guarantors on the 2007 Note. The report further stated that the author "believe[d] the intent was for the 2007 Note to replace the previous notes and to become the sole operative note." But the report recommended obtaining assignment of the 2004 and 2006 notes as part of the acquisition of the 2007 Note. In addition to the due diligence report, Pineda's foreclosure authorization only listed the 2007 Guarantors, and omitted Drs. Guajardo and Wong. Although Pineda's internal documents cannot address the intent between TSB and Drs. Guajardo and Wong, the information Pineda relied upon is consistent with the testimony of the Drs. Guajardo and Wong, as well as others, that TSB intended to release Drs. Guajardo and Wong from their 2006 individual guaranties.

The trial court withdrew its summary judgment on this issue after finding there was a fact issue as to the parties' intent. The jury answered the question of intent, finding that TSB intended to release Drs. Guajardo and Wong from the 2006 Guaranty. We conclude this finding is supported by factually sufficient evidence and was not precluded as a matter of law. Accordingly, we overrule Pineda's fifth issue and overrule the remainder of its seventh issue.

26

## V. CROSS-APPEAL ISSUES

Guarantors filed two conditional cross-appeal issues: (1) the trial court erred in granting summary judgment on Guarantors counterclaims and defenses and (2) the trial court erroneously granted summary judgment without allowing time for adequate discovery; the motions were conclusory and mischaracterized the claims and defenses; and Guarantors presented evidence in support of their claims and defenses.

By their second cross-appeal issue that we address first, Guarantors complain that the trial court erred in granting Pineda's no-evidence motions for summary judgment when Guarantors did not have adequate time for discovery.

### A. Standard of Review and Applicable Law

"Under Rule 166a(i), a party may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). A party may move for summary judgment on no-evidence grounds only "[a]fter adequate time for discovery." TEX. R. CIV. P. 166a(i). The official comment to Rule 166a(i) states that "[a] discovery period set by pretrial order should be adequate opportunity for discovery unless there is a showing to the contrary, and ordinarily a [no-evidence] motion . . . would be permitted after the period but not before." *Id.* cmt. "This comment, unlike other notes and comments in the rules of civil procedure, was specifically intended to inform the construction and application of the rule." *Aguirre v. Phillips Props., Inc.*, 111 S.W.3d 328, 344 (Tex. App.—Corpus Christi–Edinburg 2003, pet. denied) (op.

on reh'g); *see also Castillo v. Mizpah Residential Care*, No.13-12-00719-CV, 2014 WL 2159255, at *2 (Tex. App.—Corpus Christi–Edinburg May 22, 2014, pet. denied) (mem. op.).

In addition to the rule commentary on adequate time for discovery, a trial court may order a continuance of a summary judgment hearing if it appears "from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition." TEX. R. CIV. P. 166a(g); *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004). We review the trial court's decision regarding a continuance for an abuse of discretion. *Joe*, 145 S.W.3d 161. "A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Id.*

> We have considered the following nonexclusive factors when deciding whether a trial court abused its discretion in denying a motion for continuance seeking additional time to conduct discovery: the length of time the case has been on file, the materiality and purpose of the discovery sought, and whether the party seeking the continuance has exercised due diligence to obtain the discovery sought.

*Id.*; *McInnes v. Malia*, 261 S.W.3d 197, 201 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The *McInnes* Court noted that "a no-evidence summary judgment motion ordinarily is not permitted before the expiration of the discovery period set by the pre-trial order," based upon commentary to the rule change allowing a no-evidence motion for summary judgment. *Id.* at 200.

In *McInnes*, the trial court granted a no-evidence summary judgment more than five months before the end of the discovery period in a complex legal malpractice case arising out of the plaintiff's previous medical malpractice case. *Id.* at 202–03. "The time

28

allocated for discovery in the docket control order is a strong indicator of adequate time, though the deadline for discovery is not a conclusive measure of 'adequate time.'" *Id.* at 203. The court of appeals reversed, holding that the plaintiff had not had an adequate time for discovery. *Id.*; *see also Castillo*, 2014 WL 2159255, at *11 (reversing no evidence summary judgment for lack of adequate time for discovery). "[T]he no-evidence rule, by its very language, is to be used *following* discovery." *Fort Brown Villas III Condo. Ass'n v. Gllenwater*, 285 S.W.3d 879, 882 (Tex. 2009) (emphasis added).

## B.    Relevant Background Facts

Pineda filed its original petition in September 2013. Many of the Guarantors answered and sent requests for disclosures to Pineda in October 2013. Some Guarantors were not served until December 2013 and February 2014. Pineda foreclosed on BSH on September 2, 2014, which changed the posture of the litigation. The Guarantors sent additional discovery to Pineda in October 2014 and sought a date for Pineda's corporate representative deposition. In November 2014, Pineda filed its first motion for no-evidence summary judgment on the Guarantor's defenses. No scheduling order was in place at the time Pineda filed its motion.

After the motion for summary judgment was filed, the parties agreed to a scheduling order that set trial for February 2015, closed discovery on January 15, 2015, and required dispositive motions to be filed by January 28, 2015. In late November 2014, Pineda filed a motion for protective order seeking protection from certain discovery. In December 2014, Pineda filed a second no-evidence motion for summary judgment on certain issues. The depositions of the Guarantors were taken in November and

December 2014.

Pineda refused to respond to discovery related to the value of BSH, any due diligence performed by Pineda before acquiring BSH, bids to purchase BSH, advertising of the notes and liens purchased by Pineda related to BSH, and documents related to ownership and transfer of the note and liens. According to Pineda, these same topics were off-limits during any corporate representative deposition. Pineda also refused to appear for corporate representative depositions according to Guarantors. Guarantors filed their motion to continue the summary judgment hearing, their response to Pineda's motion for protective order, and their motion to compel discovery from Pineda, a week before the scheduled February 11, 2015 hearing.

After the hearing, on February 19, 2015, the trial court granted Pineda's motion for protective order and sustained Pineda's objections to discovery on the amount paid for the 2007 Note and the value of BSH. That same date, the trial court granted Pineda's no-evidence motion for summary judgment on Pineda's duty to act reasonably or in good faith. The trial court further dismissed with prejudice Guarantor's counterclaims for civil conspiracy, breach of good faith and fair dealing, and bad faith and unreasonable foreclosure.

Pineda's traditional motion for partial summary judgment seeking a deficiency judgment against the Guarantors and its two no-evidence motions on Guarantors' defenses and counterclaims remained pending. After substantial briefing and additional motions were filed, supplemented, and amended, a new scheduling order was signed setting trial for April 11, 2016. The motions for summary judgment were heard on

October 7, 2015, after which the trial court advised the parties that Pineda's summary judgment motions would be granted.   The trial court did not rule on the pending discovery motions.[14]   The final judgment was signed on February 17, 2016.

## C.    Discussion

In its February 2015 order, the trial court found that the value of BSH and the amount Pineda paid for the 2007 note were not relevant in the suit to collect on the guaranties.   The record does not state the trial court's reasoning, but Pineda argued that the 2007 guaranties waived any rights the Guarantors had to seek relief from their unconditional guaranties.   The Guarantors argued that they had counterclaims and unwaived defenses to which the evidence was relevant.   After it disallowed the discovery, the trial court found the Guarantors' claims to be without merit.   The trial court's summary judgment ruling that foreclosure was properly conducted was in effect at the time of trial, although in Spring 2016 the later-appointed judge permitted the Guarantors to conduct further discovery and allowed them to try the wrongful foreclosure defense.

Pineda filed its no-evidence summary judgment motions before and at the very beginning of the discovery period and stonewalled discovery.   *See McInnes*, 261 S.W.3d at 201.   Discovery disputes between the parties were still unresolved when the trial court granted its second round of summary judgments in favor of Pineda six months before the

---

[14] Guarantors' pending discovery motions included a motion to compel corporate representative depositions for which Pineda had never appeared after notices were issued beginning in September 2014, October 2014, and in mid-2015, a description of documents that were allegedly wrongfully withheld by Pineda that supported Guarantor's claims of civil conspiracy between Pineda and Compass, fraud and fraudulent inducement by Compass which could be defensive against Pineda.   Part of the relief Guarantors sought was a continuance of the summary judgment hearing date.

second trial date and before the close of the second scheduling order's discovery period.

This case involves a complex commercial transaction with numerous defendants (Guarantors) whose interests are not fully aligned. The Guarantors raised numerous defenses to the collection of the deficiency judgment by Pineda. Pineda successfully prevented discovery of documents and postponed its corporate representative's testimony until after the summary judgments were granted.

Some discovery was obtained before trial, but it was not obtained before the first summary judgment in February 2015 and was disregarded by the trial court before the grant of the first "final judgment" in February 2016.[15] The denial of that discovery harmed the Guarantors, in part, by preventing them from demonstrating that Pineda was not a holder in due course and that Guarantors had a viable breach of contract counterclaim they could assert against Pineda that arose from Guarantors' dealings with Compass.[16] *See Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex. 2009) (requiring a finding of harm from abuse of discretion); *Remaley v. TA Operating LLC*, 561 S.W.3d 675, 683 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

Under these circumstances, we conclude the trial court abused its discretion by

---

[15] The deposition of Jeffrey Livingston, the attorney hired by Pineda to bid on the hospital at the foreclosure sale, was not taken until July 2015. Dennis Stratford, the senior vice president in charge of asset management for Capital Crossing, was not deposed until January 2017, and Guarantors complained of Pineda's continued lack of document production in readable form in February 2017.

[16] According to Guarantors' evidence, Compass breached its agreement to maintain the confidentiality of Guarantors' confidential financial information to Guarantors' detriment by allowing Pineda and other prospective commercial purchasers of Compass's bundled portfolios to bid on the notes knowing which ones had guarantees while concealing from Guarantors the pending sale of their note. *See* 2007 Loan Agreement ¶ 6.08. The trial court granted Pineda's motion for summary judgment and failed to rule on Guarantors' competing motions for summary judgment. Guarantors' evidence raised a fact question on the issue of Compass's breach and on Pineda's status as a holder in due course.

granting Pineda's no-evidence summary judgment motions before adequate time for discovery. *See* TEX. R. CIV. P. 166a(i); *McInnes*, 261 S.W.3d at 205; *see also Castillo*, 2014 WL 2159255, at *11. In addition, because the trial court granted Pineda's motion for summary judgment on the guarantees without considering Guarantors' defenses to payment, including Guarantors' claims that Pineda was not a holder in due course and was subject to any defenses available as to Compass, and Guarantors' competing breach of contract and other claims, the affirmative summary judgment for Pineda on the guarantees must be reversed as well.

We sustain Guarantors' second cross-appeal issue.

We do not address Guarantors' conditional cross points because the Court did not grant relief that involves those cross points. *See* TEX. R. APP. P. 47.1

## VI. DEFICIENCY JUDGMENT

Pineda's sixth issue argues that the trial court erred by failing to render a deficiency judgment. Because of our resolution of other issues we need not address Pineda's sixth issue. *See* TEX. R. APP. P. 47.1; *Lance*, 543 S.W.3d at 740.

## VII. CONCLUSION

We affirm the judgment of the trial court insofar as it found Drs. Guajardo and Wong's are not liable on the 2007 Guaranties. We reverse the judgment as to Guarantors' claim for wrongful foreclosure and we render judgment that Guarantors take nothing on that claim. We reverse the trial court's grant of summary judgment for Pineda on its claim for deficiency judgment, and reverse the summary judgments granted against the Guarantors on their counterclaims and defenses. We remand for further proceedings

consistent with this memorandum opinion.

GINA M. BENAVIDES,
Justice

Delivered and filed the
26th day of September, 2019.